MARCUS ET AL. *v.* SEARCH WARRANT OF PROPERTY AT 104 EAST TENTH STREET, KANSAS CITY, MISSOURI, ET AL.

No. 225.   Argued March 30, 1961.—Decided June 19, 1961.

*Sidney M. Glazer* argued the cause for appellants. With him on the brief were *Morris A. Shenker* and *Bernard J. Mellman.*

*Fred L. Howard,* Assistant Attorney General of Missouri, argued the cause for appellees. With him on the brief were *Thomas F. Eagleton,* Attorney General, and *John C. Bauman,* Assistant Attorney General.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This appeal presents the question whether due process under the Fourteenth Amendment was denied the appellants by the application in this case of Missouri's procedures authorizing the search for and seizure of allegedly obscene publications preliminarily to their destruction by burning or otherwise if found by a court to be obscene. The procedures are statutory, but are supplemented by a rule of the Missouri Supreme Court.[1] The warrant for search for and seizure of obscene material issues on a sworn complaint filed with a judge or magis-

---

[1] These procedures are separate from and in addition to the State's criminal statutes. See *State* v. *Mac Sales Co.,* 263 S. W. 2d 860. The criminal statutes are Mo. Rev. Stat., §§ 563.270, 563.280, 563.290; see also § 563.310.

trate.[2] If the complainant states "positively and not upon information or belief," or states "evidential facts from which such judge or magistrate determines the existence of probable cause" to believe that obscene material "is being held or kept in any place or in any building," "such judge or magistrate shall issue a search warrant directed to any peace officer commanding him to search the place therein described and to seize and bring before such judge or magistrate the personal property therein described."[3] The owner of the property is not afforded a

[2] Mo. Rev. Stat., § 542.380, in pertinent part provides:

"Upon complaint being made, on oath, in writing, to any officer authorized to issue process for the apprehension of offenders, that any of the property or articles herein named are kept within the county of such officer, if he shall be satisfied that there is reasonable ground for such complaint, shall issue a warrant to the sheriff or any constable of the county, directing him to search for and seize any of the following property or articles:

. . . . .

"(2) Any of the following articles, kept for the purpose of being sold, published, exhibited, given away or otherwise distributed or circulated, viz.: obscene, lewd, licentious, indecent or lascivious books, pamphlets, ballads, papers, drawings, lithographs, engravings, pictures, models, casts, prints or other articles or publications of an indecent, immoral or scandalous character, or any letters, handbills, cards, circulars, books, pamphlets or advertisements or notices of any kind giving information, directly or indirectly, when, where, how or of whom any of such things can be obtained." These procedures also govern seizure and condemnation of gambling paraphernalia, contraceptive devices, and tools and other articles used to manufacture or produce such items. Fraudulent, forged, and counterfeited writings and other articles, and the instruments used to make them, are also declared contraband and subject to seizure. § 542.440.

[3] Missouri Supreme Court Rule 33.01 of the Rules of Criminal Procedure provides:

"(a) If a complaint in writing be filed with the judge or magistrate of any court having original jurisdiction to try criminal offenses stating that personal property . . . the seizure of which under search warrant is now or may hereafter be authorized by any statute of this

hearing before the warrant issues; the proceeding is *ex parte*. However, the judge or magistrate issuing the warrant must fix a date, not less than five nor more than 20 days after the seizure, for a hearing to determine whether the seized material is obscene.[4] The owner of the material may appear at such hearing and defend

State, is being held or kept at any place or in any building . . . within the territorial jurisdiction of such judge or magistrate, and if such complaint be verified by the oath or affirmation of the complainant and states such facts positively and not upon information or belief; or if the same be supported by written affidavits verified by oath or affirmation stating evidential facts from which such judge or magistrate determines the existence of probable cause, then such judge or magistrate shall issue a search warrant directed to any peace officer commanding him to search the place therein described and to seize and bring before such judge or magistrate the personal property therein described.

"(b) The complainant and the warrant issued thereon must contain a description of the personal property to be searched for and seized and a description of the place to be searched, in sufficient detail and particularity to enable the officer serving the warrant to readily ascertain and identify the same."

[4] Mo. Rev. Stat., § 542.400 provides:

"The judge or magistrate issuing the warrant shall set a day, not less than five days nor more than twenty days after the date of such service and seizure, for determining whether such property is the kind of property mentioned in section 542.380, and shall order the officer having such property in charge to retain possession of the same until after such hearing. Written notice of the date and place of such hearing shall be given, at least five days before such date, by posting a copy of such notice in a conspicuous place upon the premises in which such property is seized, and by delivering a copy of such notice to any person claiming an interest in such property, whose name may be known to the person making the complaint or to the officer issuing or serving such warrant, or leaving the same at the usual place of abode of such person with any member of his family or household above the age of fifteen years. Such notice shall be signed by the magistrate or judge or by the clerk of the court of such judge."

against the charge.[5]   No time limit is provided within which the judge must announce his decision.   If the judge finds that the material is obscene, he is required to order it to be publicly destroyed, by burning or otherwise; if he finds that it is not obscene, he shall order its return to its owner.[6]

The Missouri Supreme Court sustained the validity of the procedures as applied in this case.   334 S. W. 2d 119. The appellants brought this appeal here under 28 U. S. C. § 1257 (2).   We postponed consideration of the question of our jurisdiction to the hearing of the case on the merits. 364 U. S. 811.   We hold that the appeal is properly here, see *Dahnke-Walker Milling Co.* v. *Bondurant*, 257 U. S. 282, and turn to the merits.

Appellant, Kansas City News Distributors, managed by appellant, Homer Smay, is a wholesale distributor of magazines, newspapers and books in the Kansas City area. The other appellants operate five retail newsstands

---

[5] Mo. Rev. Stat., § 542.410 provides:

"Rights of property owner.—The owner or owners of such property may appear at such hearing and defend against the charges as to the nature and use of the property so seized, and such judge or magistrate shall determine, from the evidence produced at such hearing, whether the property is the kind of property mentioned in section 542.380."

[6] Mo. Rev. Stat., § 542.420 provides:

"Disposition of property.—If the judge or magistrate hearing such cause shall determine that the property or articles are of the kind mentioned in section 542.380, he shall cause the same to be publicly destroyed, by burning or otherwise, and if he find that such property is not of the kind mentioned, he shall order the same returned to its owner.  If it appears that it may be necessary to use such articles or property as evidence in any criminal prosecution, the judge or magistrate shall order the officer having possession of them to retain such possession until such necessity no longer exists, and they shall neither be destroyed nor returned to the owner until they are no longer needed as such evidence."

in Kansas City. In October 1957, Police Lieutenant Coughlin of the Kansas City Police Department Vice Squad was conducting an investigation into the distribution of allegedly obscene magazines. On October 8, 1957, he visited Distributors' place of business and showed Smay a list of magazines. Smay admitted that his company distributed all but one of the magazines on the list. The following day, October 9, Lieutenant Coughlin visited the five newsstands and purchased one magazine at each.[7] On October 10 the officer signed and filed six sworn complaints in the Circuit Court of Jackson County, stating in each complaint that "of his own knowledge" the appellant named therein, at its stated place of business, "kept for the purpose of [sale] . . . obscene . . . publications . . . ." No copy of any magazine on Lieutenant Coughlin's list, or purchased by him at the newsstands, was filed with the complaint or shown to the circuit judge. The circuit judge issued six search warrants authorizing, as to the premises of the appellant named in each, "any peace officer in the State of Missouri . . . [to] search the said premises . . . within 10 days after the issuance of this warrant by day or night, and . . . seize . . . [obscene materials] and take same into your possession . . . ."

All of the warrants were executed on October 10, but by different law enforcement officers. Lieutenant Coughlin with two other Kansas City police officers, and an officer of the Jackson County Sheriff's Patrol, executed the warrant against Distributors. Distributors' stock of magazines runs "into hundreds of thousands . . . [p]robably closer to a million copies." The officers examined the publications in the stock on the main floor of the establishment,

---

[7] He bought a copy of the same magazine at three of the stands, a copy of another edition of this magazine at a fourth stand, and a copy of one other magazine at the fifth stand.

not confining themselves to Lieutenant Coughlin's original list. They seized all magazines which "[i]n our judgment" were obscene; when an officer thought "a magazine . . . ought to be picked up" he seized all copies of it. After three hours the examination was completed and the magazines seized were "hauled away in a truck and put on the 15th floor of the courthouse." A substantially similar procedure was followed at each of the five newsstands. Approximately 11,000 copies of 280 publications, principally magazines but also some books and photographs, were seized at the six places.[8]

The circuit judge fixed October 17 for the hearing, which was later continued to October 23. Timely motions were made by the appellants to quash the search warrants and to suppress as evidence the property seized, and for the immediate return of the property. The motions were rested on a number of grounds but we are concerned only with the challenge to the application of the procedures in the context of the protections for free speech and press assured against state abridgment by the Fourteenth Amendment.[9] Unconstitutionality in violation of the Fourteenth Amendment was asserted because the procedures as applied (1) allowed a seizure by police officers "without notice or any hearing afforded to the movants prior to seizure for the purpose of determining whether or not these . . . publications are ob-

---

[8] The publications seized included so-called "girlie" magazines, nudist magazines, treatises and manuals on sex, photography magazines, cartoon and joke books and still photographs.

[9] Because of the result which we reach, it is unnecessary to decide other constitutional questions raised by the appellants, (1) whether the Missouri statutes are invalid on their face as authorizing an unconstitutional censorship and previous restraint of publications; (2) whether the Missouri courts applied an unconstitutional test of obscenity; and (3) whether the publications condemned are obscene under the test of *Roth* v. *United States,* 354 U. S. 476.

scene . . . ," and (2) because they "allowed police officers and deputy sheriffs to decide and make a judicial determination after the warrant was issued as to which . . . magazines were . . . obscene . . . and were subject to seizure, impairing movants' freedom of speech and publication." The circuit judge reserved rulings on the motions and heard testimony of the police officers concerning the events surrounding the issuance and execution of the several warrants. On December 12, 1957, the circuit judge filed an unreported opinion in which he overruled the several motions and found that 100 of the 280 seized items were obscene. A judgment thereupon issued directing that the 100 items, and all copies thereof, "shall be retained by the Sheriff of Jackson County . . . as necessary evidence for the purpose of possible criminal prosecution or prosecutions, and, when such necessity no longer exists, said Sheriff . . . shall publicly destroy the same by burning within thirty days thereafter"; it ordered further that the 180 items not found to be obscene, and all copies thereof, "shall be returned forthwith by the Sheriff . . . to the rightful owner or owners . . . ."

## I.

The use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new. Historically the struggle for freedom of speech and press in England was bound up with the issue of the scope of the search and seizure power. See generally Siebert, Freedom of the Press in England, 1476–1776; Hanson, Government and the Press, 1695–1763. It was a principal instrument for the enforcement of the Tudor licensing system. The Stationers' Company was incorporated in 1557 to help implement that system and was empowered "to make search whenever it shall please them in any place, shop,

house, chamber, or building or any printer, binder or book-seller whatever within our kingdom of England or the dominions of the same of or for any books or things printed, or to be printed, and to seize, take hold, burn, or turn to the proper use of the foresaid community, all and several those books and things which are or shall be printed contrary to the form of any statute, act, or proclamation, made or to be made . . . ." [10]

An order of council confirmed and expanded the Company's power in 1566,[11] and the Star Chamber reaffirmed it in 1586 by a decree "That it shall be lawful for the wardens of the said Company for the time being or any two of the said Company thereto deputed by the said wardens, to make search in all workhouses, shops, ware-houses of printers, booksellers, bookbinders, or where they shall have reasonable cause of suspicion, and all books [etc.] . . . contrary to . . . these present ordinances to stay and take to her Majesty's use . . . ." [12]   Books thus seized were taken to Stationers' Hall where they were inspected by ecclesiastical officers, who decided whether they should be burnt.   These powers were exercised under the Tudor censorship to suppress both Catholic and Puritan dissenting literature.[13]

Each succeeding regime during turbulent Seventeenth Century England used the search and seizure power to suppress publications.   James I commissioned the ecclesiastical judges comprising the Court of High Commission "to enquire and search for . . . all heretical, schismatical and seditious books, libels, and writings, *and all other books, pamphlets and portraitures offensive to the state or set forth without sufficient and lawful authority in that*

---

[10] 1 Arber, Transcript of the Registers of the Company of Stationers of London, 1554–1640 A. D., p. xxxi.

[11] Elton, The Tudor Constitution, p. 106.

[12] Elton, *supra,* pp. 182–183.

[13] Siebert, *supra,* pp. 83, 85–86, 97.

*behalf,* . . . and the same books [etc.] and their print-ing-presses themselves likewise to seize *and so to order and dispose of them . . . as they may not after serve or be employed for any such unlawful use . . . .*" [14]   The Star Chamber decree of 1637, re-enacting the requirement that all books be licensed, continued the broad powers of the Stationers' Company to enforce the licensing laws.[15] During the political overturn of the 1640's Parliament on several occasions asserted the necessity of a broad search and seizure power to control printing.   Thus an order of 1648 gave power to the searchers "to search in any house or place where there is just cause of suspicion, that Presses are kept and employed in the printing of Scandalous and lying Pamphlets, . . . [and] to seize such scandalous and lying pamphlets as they find upon search . . . ." [16]   The Restoration brought a new licens-ing act in 1662.   Under its authority "messengers of the press" operated under the secretaries of state, who issued executive warrants for the seizure of persons and papers. These warrants, while sometimes specific in content, often gave the most general discretionary authority. For example, a warrant to Roger L'Estrange, the Sur-veyor of the Press, empowered him to "seize all seditious books and libels and to apprehend the authors, con-trivers, printers, publishers, and dispersers of them," and to "search any house, shop, printing room, chamber, warehouse, etc. for seditious, scandalous or unlicensed pic-tures, books, or papers, to bring away or deface the same, and the letter press, taking away all the copies . . . ." [17] Another warrant gave L'Estrange power to "search for

---

[14] Siebert, *supra,* p. 139, citing Pat. Roll, 9 Jac. I, Pt. 18; *id.,* II, Pt. 15.

[15] 4 Arber, *supra,* pp. 529–536.

[16] Siebert, *supra,* 214–215, note 72.

[17] Siebert, *supra,* p. 254, citing Minute Entry Book 5, p. 177.

& seize authors, contrivers, printers, . . . publishers, dispensers, & concealers of treasonable, schismaticall, seditious or unlicensed books, libells, pamphlets, or papers . . . together with all copys exemplaryes of such Books, libells, pamphlets or paper as aforesaid." [18]

Although increasingly attacked, the licensing system was continued in effect for a time even after the Revolution of 1688 and executive warrants continued to issue for the search for and seizure of offending books. The Stationers' Company was also ordered "to make often and diligent searches in all such places you or any of you shall know or have any probable reason to suspect, and to seize all unlicensed, scandalous books and pamphlets . . . ." [19] And even when the device of prosecution for seditious libel replaced licensing as the principal governmental control of the press, [20] it too was enforced with the aid of general warrants—authorizing either the arrest of all persons connected with the publication of a particular libel and the search of their premises, or the seizure of all the papers of a named person alleged to be connected with the publication of a libel. [21]

---

[18] Siebert, *supra*, p. 256, citing Entry Book, Chas. II, 1664, Vol. 21, p. 21; also Vol. 16, p. 130.

[19] Cal. St. P., Dom. Ser., 1690–1691, p. 74.

[20] One of the primary objections to licensing was its enforcement through search and seizure. The House of Commons' list of reasons why the licensing act should not be renewed included: "Because that Act subjects all Mens Houses, as well Peers as Commoners, to be searched at any Time, either by Day or Night, by a Warrant under the Sign Manual, or under the Hand of One of the Secretaries of State, directed to any Messenger, if such Messenger shall upon probable Reason suspect that there are any unlicensed Books there; and the Houses of all Persons free of the Company of Stationers are subject to the like Search, on a Warrant from the Master and Wardens of the said Company, or any One of them." 15 Journals of the House of Lords, April 18, 1695, p. 546.

[21] Siebert, *supra*, pp. 374–376.

Enforcement through general warrants was finally judicially condemned in England. This was the consequence of the struggle of the 1760's between the Crown and the opposition press led by John Wilkes, author and editor of the North Briton. From this struggle came the great case of *Entick* v. *Carrington,* 19 How. St. Tr. 1029, which this Court has called "one of the landmarks of English liberty." *Boyd* v. *United States,* 116 U. S. 616, 626. A warrant based on a charge of seditious libel issued for the arrest of Entick, writer for an opposition paper, and for the seizure of all his papers. The officers executing the warrant ransacked Entick's home for four hours and carted away great quantities of books and papers. Lord Camden declared the general warrant for the seizure of papers contrary to the common law, despite its long history. Camden said: "This power so assumed by the secretary of state is an execution upon all the party's papers, in the first instance. His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being concerned in the paper." At 1064. Camden expressly dismissed the contention that such a warrant could be justified on the grounds that it was "necessary for the ends of government to lodge such a power with a state officer; and . . . better to prevent the publication before than to punish the offender afterwards." At 1073. In *Wilkes* v. *Wood,* 19 How. St. Tr. 1153, Camden also condemned the general warrants employed against John Wilkes for his publication of issue No. 45 of the North Briton. He declared that these warrants, calling for the arrest of unnamed persons connected with the alleged libel and seizure of their papers, amounted to a "discretionary power given to messengers to search wherever their suspicions may chance to fall. If such a power is

truly invested in a secretary of state, and he can delegate this power, it certainly may affect the person and property of every man in this kingdom, and is totally subversive of the liberty of the subject." *Id.*, 1167.[22]

This history was, of course, part of the intellectual matrix within which our own constitutional fabric was shaped. The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression. For the serious hazard of suppression of innocent expression inhered in the discretion confided in the officers authorized to exercise the power.

## II.

The question here is whether the use by Missouri in this case of the search and seizure power to suppress

---

[22] A contemporary London pamphlet summed up the widespread indignation against the use of the general warrant for the seizure of papers: "In such a party-crime, as a public libel, who can endure this assumed authority of taking all papers indiscriminately? . . . where there is even a charge against one particular paper, to seize *all*, of every kind, is extravagant, unreasonable and inquisitorial. It is infamous in theory, and downright tyranny and despotism in practice." Father of Candor, A Letter Concerning Libels, Warrants, and the Seizure of Papers, p. 48 (2d ed. 1764, J. Almon printer).

See generally Lasson, The History and Development of the Fourth Amendment, pp. 42–50; Hanson, Government and the Press, 1695–1763, pp. 29–32, 49–50. An even broader form of general warrant was the writ of assistance, which met such vigorous opposition in the American Colonies prior to the Revolution. Unlike the warrants of the North Briton affair and *Entick* v. *Carrington*, which were at least concerned with a particular designated libel, these writs empowered the executing officer to seize any illegally imported goods or merchandise. Moreover, in addition to authorizing search without limit of place, they had no fixed duration. In effect, complete discretion was given to the executing officials; in the words of James Otis, their use placed "the liberty of every man in the hands of every petty officer." Tudor, Life of James Otis (1823), p. 66. See Lasson, *supra*, pp. 51–78.

obscene publications involved abuses inimical to protected expression. We held in *Roth* v. *United States,* 354 U. S. 476, 485,[23] that "obscenity is not within the area of constitutionally protected speech or press." But in *Roth* itself we expressly recognized the complexity of the test of obscenity fashioned in that case, and the vital necessity in its application of safeguards to prevent denial of "the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest." *Id.,* p. 488. We have since held that a State's power to suppress obscenity is limited by the constitutional protections for free expression. In *Smith* v. *California,* 361 U. S. 147, 155, we said, "The existence of the State's power to prevent the distribution of obscene matter does not mean that there can be no constitutional barrier to any form of practical exercise of that power," inasmuch as "our holding in *Roth* does not recognize any state power to restrict the dissemination of books which are not obscene." *Id.,* p. 152. We therefore held that a State may not impose absolute criminal liability on a bookseller for the possession of obscene material, even if it may dispense with the element of *scienter* in dealing with such evils as impure food and drugs. We remarked the distinction between the cases: "There is no specific constitutional inhibition against making the distributors of food the strictest censors of their merchandise, but the constitutional guarantees of the freedom of speech and of the press stand in the way of imposing a similar requirement on the bookseller." *Id.,* pp. 152–153. The Missouri Supreme Court's assimilation of obscene literature to gambling paraphernalia or other contraband for purposes of search and seizure does not therefore answer the appellants' constitutional claim, but merely restates the issue

---

[23] This holding applied also to the obscenity question raised under the Fourteenth Amendment in *Alberts* v. *California,* decided in the same opinion.

whether obscenity may be treated in the same way. The authority to the police officers under the warrants issued in this case, broadly to seize "obscene . . . publications," poses problems not raised by the warrants to seize "gambling implements" and "all intoxicating liquors" involved in the cases cited by the Missouri Supreme Court. 334 S. W. 2d, at 125. For the use of these warrants implicates questions whether the procedures leading to their issuance and surrounding their execution were adequate to avoid suppression of constitutionally protected publications. ". . . [T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn. . . . The separation of legitimate from illegitimate speech calls for . . . sensitive tools . . . ." *Speiser* v. *Randall,* 357 U. S. 513, 525.[24] It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity as here involved without regard to the possible consequences for constitutionally protected speech.

We believe that Missouri's procedures as applied in this case lacked the safeguards which due process demands to assure nonobscene material the constitutional protection to which it is entitled. Putting to one side the fact that no opportunity was afforded the appellants to elicit and contest the reasons for the officer's belief, or otherwise to argue against the propriety of the seizure to the issuing judge, still the warrants issued on the strength

---

[24] Lord Camden in *Entick* v. *Carrington* recognized that there was no justification for the abuse of the search and seizure power in suppressing seditious libel, even if the view were accepted that "men ought not to be allowed to have such evil instruments in their keeping." 19 How. St. Tr., at 1072. He said, "If [libels may be seized], I am afraid, that all the inconveniences of a general seizure will follow upon a right allowed to seize a part. The search in such cases will be general, and every house will fall under the power of a secretary of state to be rummaged before proper conviction." *Id.,* at 1071.

of the conclusory assertions of a single police officer, without any scrutiny by the judge of any materials considered by the complainant to be obscene. The warrants gave the broadest discretion to the executing officers; they merely repeated the language of the statute and the complaints, specified no publications, and left to the individual judgment of each of the many police officers involved the selection of such magazines as in his view constituted "obscene . . . publications." So far as appears from the record, none of the officers except Lieutenant Coughlin had previously examined any of the publications which were subsequently seized. It is plain that in many instances, if not in all, each officer actually made *ad hoc* decisions on the spot and, gauged by the number of publications seized and the time spent in executing the warrants, each decision was made with little opportunity for reflection and deliberation. As to publications seized because they appeared on the Lieutenant's list, we know nothing of the basis for the original judgment that they were obscene. It is no reflection on the good faith or judgment of the officers to conclude that the task they were assigned was simply an impossible one to perform with any realistic expectation that the obscene might be accurately separated from the constitutionally protected. They were provided with no guide to the exercise of informed discretion, because there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity. See generally 1 Chafee, Government and Mass Communications, pp. 200–218. In consequence there were suppressed and withheld from the market for over two months 180 publications not found obscene.[25] The fact that only one-third of the

---

[25] Among the publications ordered returned were such titles as "The Dawn of Rational Sex Ethics," "Sex Symbolism," "Notes on Cases of Sexual Suppression," "Your Affections, Emotions and Feel-

publications seized were finally condemned strengthens the conclusion that discretion to seize allegedly obscene materials cannot be confided to law enforcement officials without greater safeguards than were here operative. Procedures which sweep so broadly and with so little discrimination are obviously deficient in techniques required by the Due Process Clause of the Fourteenth Amendment to prevent erosion of the constitutional guarantees.[26]

ings," "Sexual Impotence, Its Causes and Treatments," "The Psychology of Sex Life," "Freud on Sleep and Sexual Dreams," "The Determination of Sex," "Sex and Psychoanalysis," "Artificial Insemination," "Syphilis, A Treatise for the American Public," "What You Should Know About Sexual Impotency," "Variations in Sexual Behavior," "Sex Life in Marriage," "Psychopathia Sexualis," "The Sex Technique in Marriage," "Sexual Deviations," "Sex Practice in Later Years," and "Marriage, Sex, and Family Problems."

[26] English practice in such cases has placed greater restraint on the seizure power. Seizure of obscene material, as a prelude to condemnation, was authorized there by Lord Campbell's Obscene Publications Act of 1857, 20 & 21 Vict., c. 83. As originally proposed, that statute would have allowed search for and seizure of obscene matter either under authority granted by magistrates or on warrants granted by the Chief Commissioner of Police. Moreover, the affidavit for obtaining a warrant would have been required to contain merely the statement that the person making it had reasonable ground for suspicion that obscene publications were kept on the premises to be searched. See 146 Hansard's Parliamentary Debates, 3d Series, p. 866. These provisions met vigorous opposition in Parliament. A number of members emphasized that the difficulty of defining obscenity made broad search powers in police hands extremely dangerous. See id., pp. 330–332, 1360–1362, 147 Hansard, supra, pp. 1863–1864. As a result, amendments were adopted removing the grant of authority to the police commissioner to authorize a search and seizure, requiring greater specificity in the allegations before a warrant could be issued, and providing that warrants could issue only for the seizure of books the publication of which would constitute a common-law misdemeanor. Lord Lyndhurst, draftsman of these amendments, explained: "I have now provided that the person shall swear that he has reason to believe, and that he does believe, that there are such publications in

## III.

The reliance of the Missouri Supreme Court upon *Kingsley Books, Inc.,* v. *Brown,* 354 U. S. 436, is misplaced.   The differences in the procedures under the New York statute upheld in that case and the Missouri procedures as applied here are marked.   They amount to the distinction between "a 'limited injunctive remedy,' under closely defined procedural safeguards, against the sale and distribution of written and printed matter found after due trial to be obscene," *Kingsley Books, supra,* at 437, and a scheme which in operation inhibited the circulation of publications indiscriminately because of the

such a place, and shall further state to the magistrate the reasons which lead to that belief.   Nor does it stop there.   The most material Amendment is, that he must state what the publications are, and that they are of such a nature that, if published, the party publishing them will be guilty of a misdemeanour.   The magistrate must also be satisfied that the case is a proper one for a prosecution . . . ." 146 Hansard, *supra,* at p. 1360.   The Lord Chancellor summarized the effect of the changes: "As the Bill now stood, these search-warrants would only be granted after great precautions . . . ." *Id.,* p. 1362.

According to a recent summary of procedures to obtain a warrant under that Act, a police officer would ordinarily buy copies of a work he suspected of obscenity.   They would be examined by the police and sent to the Director of Public Prosecutions.   The latter would return them with advice as to whether a warrant should be applied for.   If a decision were made to seek a warrant, the publications would be laid before a magistrate with the sworn affidavit of the officer, in order that he might be satisfied that they were of the character necessary to justify seizure.   See Memorandum of the Association of Chief Police Officers of England and Wales, Minutes of Evidence Taken Before the Select Committee of the House of Commons on the Obscene Publications Bill, 1956–1957, pp. 132–136. See also, *id.,* p. 23.

The Act was replaced by the Obscene Publications Act of 1959, 7 & 8 Eliz. II, c. 66.   See 23 Mod. L. Rev. 285.

absence of any such safeguards. *First,* the New York injunctive proceeding was initiated by a complaint filed with the court which charged that a particular named obscene publication had been displayed, and to which were annexed copies of the publication alleged to be obscene.[27] The court, in restraining distribution pending final judicial determination of the claim, thus had the allegedly obscene material before it and could exercise an independent check on the judgment of the prosecuting authority at a point before any restraint took place. *Second,* the restraints in *Kingsley Books,* both temporary and permanent, ran only against the named publication; no catchall restraint against the distribution of all "obscene" material was imposed on the defendants there, comparable to the warrants here which authorized a mass seizure and the removal of a broad range of items from circulation.[28] *Third, Kingsley Books* does not support the proposition that the State may impose the extensive

---

[27] The feasibility of particularization in complaint and warrant in a case such as the present is apparent, since the publications were sold on newsstands distributing to the public. Compare Lord Camden's remark in *Entick* v. *Carrington,* directed to the contention that a general warrant might be justifiable as a means of uncovering evidence of crime: "If . . . a right of search for the sake of discovering evidence ought in any case to be allowed, this crime [seditious libel] above all others ought to be excepted, as wanting such a discovery less than any other. It is committed in open daylight, and in the face of the world; . . ." 19 How. St. Tr., at 1074.

[28] The trial judge in *Kingsley Books* refused to enjoin the distribution of future issues of the publication in question, stating: "[u]nless the work be before the court at the time of the hearing at which the injunction is sought, it is inappropriate to make a judicial determination with respect to it. In respect of this feature of the case, the plaintiff seeks a likely trespass upon a constitutionally protected area, and the court must reject that prayer." 208 Misc. 150, 168–169, 142 N. Y. S. 2d 735, 751. Cf. *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697.

restraints imposed here on the distribution of these publications prior to an adversary proceeding on the issue of obscenity, irrespective of whether or not the material is legally obscene. This Court expressly noted there that the State was not attempting to punish the distributors for disobedience of any interim order entered before hearing. The Court pointed out that New York might well construe its own law as not imposing any punishment for violation of an interim order were the book found not obscene after due trial. 354 U. S., at 443, n. 2. But there is no doubt that an effective restraint—indeed the most effective restraint possible—was imposed prior to hearing on the circulation of the publications in this case, because all copies on which the police could lay their hands were physically removed from the newsstands and from the premises of the wholesale distributor. An opportunity comparable to that which the distributor in *Kingsley Books* might have had to circulate the publication despite the interim restraint and then raise the claim of nonobscenity by way of defense to a prosecution for doing so was never afforded these appellants because the copies they possessed were taken away. Their ability to circulate their publications was left to the chance of securing other copies, themselves subject to mass seizure under other such warrants. The public's opportunity to obtain the publications was thus determined by the distributor's readiness and ability to outwit the police by obtaining and selling other copies before they in turn could be seized. In addition to its unseemliness, we do not believe that this kind of enforced competition affords a reasonable likelihood that nonobscene publications, entitled to constitutional protection, will reach the public. A distributor may have every reason to believe that a publication is constitutionally protected and will be so held after judicial hearing, but his belief is unavailing as against the contrary judgment of

the police officer who seizes it from him.[29]   Finally, a subdivision of the New York statute in *Kingsley Books* required that a judicial decision on the merits of obscenity be made within two days of trial, which in turn was required to be within one day of the joinder of issue on the request for an injunction.[30]   In contrast, the Missouri statutory scheme drawn in question here has no limitation on the time within which decision must be made, only a provision for rapid trial of the issue of obscenity.   And in fact over two months elapsed between seizure and decision.[31]   In these circumstances the restraint on the circu-

---

[29] Cf. Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 539.

Blackstone's often-quoted formulation of the principle of freedom of the press, though restricted to the prohibition of *"previous* restraints upon publications," nevertheless acknowledged the importance of an adjudicatory procedure as a protection against the suppression of inoffensive publications.   He wrote: "to punish (as the law does at present) any dangerous or offensive writings, which, when published, shall *on a fair and impartial trial be adjudged of a pernicious tendency,* is necessary for the preservation of peace and good order . . . ."   4 Commentaries, pp. 151–152.   (Emphasis added.) Compare Butler, J., dissenting in *Near* v. *Minnesota ex rel. Olson, supra,* p. 723: "The decision of the Court in this case declares Minnesota and every other State powerless to restrain by injunction the business of publishing and circulating among the people malicious, scandalous and defamatory periodicals that *in due course of judicial procedure has been adjudged to be a public nuisance."*   (Emphasis added.)

[30] This provision was not directly implicated in *Kingsley Books* because the parties had waived the provision for immediate trial.

[31] Compare the objection of the House of Commons to renewal of licensing: "Because that Act appoints no Time wherein the Archbishop, or Bishop of London, shall appoint a learned Man, or that One or more of the Company of Stationers shall go to the Customhouse, to view imported Books; so that they or either of them may delay it till the Importer may be undone, by having so great a Part of his Stock lie dead . . . ."   15 Journals of the House of Lords, April 18, 1695, p. 546.

lation of publications was far more thoroughgoing and drastic than any restraint upheld by this Court in *Kingsley Books.*

Mass seizure in the fashion of this case was thus effected without any safeguards to protect legitimate expression. The judgment of the Missouri Supreme Court sustaining the condemnation of the 100 publications therefore cannot be sustained. We have no occasion to reach the question of the correctness of the finding that the publications are obscene. Nor is it necessary for us to decide in this case whether Missouri lacks all power under its statutory scheme to seize and condemn obscene material. Since a violation of the Fourteenth Amendment infected the proceedings, in order to vindicate appellants' constitutional rights the judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK, whom MR. JUSTICE DOUGLAS joins, concurring.

The warrant used to search appellants' premises made no attempt specifically to describe the "things to be seized," as the Fourth Amendment requires. As the historical summary in the Court's opinion demonstrates, a major purpose of adopting that Amendment was to bar the Federal Government from using precisely this kind of general warrant to support "unreasonable searches and seizures" of the "papers" and "effects" of persons having possession of them. See especially *Entick* v. *Carrington,* 19 Howell's State Trials 1029, at 1073–1076; *Boyd* v. *United States,* 116 U. S. 616, 624–630; *Frank* v. *Maryland,* 359 U. S. 360, 374 (dissenting opinion). It is my view that the Fourteenth Amendment makes the Fourth Amendment applicable to the States to the full extent of its terms, just as it applies to the Federal Government. See *Adamson* v. *California,* 332 U. S. 46, 68

(dissenting opinion).  Only last Term we said that in *Wolf* v. *Colorado,* 338 U. S. 25, "it was unequivocally determined by a unanimous Court that the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers."  *Elkins* v. *United States,* 364 U. S. 206, 213. And in *Mapp* v. *Ohio, ante,* p. 643, it is said that "[s]ince the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government."  Since the State has used a general warrant in this case in violation of the prohibitions of the Fourth and Fourteenth Amendments, I concur in reversal of the judgment.