**In re SEARCH WARRANT DATED JULY 4, 1977, FOR PREMISES AT 2125 S STREET, NORTHWEST, WASHINGTON, D.C.**

Misc. No. 77–0151.

United States District Court,
District of Columbia.

July 27, 1977.

---

Philip Hirschkop, Alexandria, Va., Daniel Sheehan, Washington, D.C., Earl Dudley, Alexandria, Va., for petitioner.

Brian W. Shaughnessy, Raymond Banoun, Asst. U.S. Attys., Washington, D.C., for respondent.

## MEMORANDUM AND ORDER

BRYANT, Chief Judge.

On July 8, 1977, agents of the Federal Bureau of Investigation (FBI) executed a search warrant on the premises of the Founding Church of Scientology, Washington, D.C.[1] Issued on the strength of a lengthy affidavit alleging that certain Church officials had conspired "to steal documents from the Government of the United States by means of the burglary of U.S. Government offices and theft by operatives of the Church in the employ of the U.S. Government" and to obstruct justice by "preparing a false response to expected inquiries . . . by law enforcement authorities and federal grand juries,"[2] the warrant directed the agents to file cabinets located in the rear of the fourth floor of the building that houses the Church's Washington offices. There, the affiant stated he had probable cause to believe, the agents would find copies of the stolen documents as well as written plans, scenarios, directives and a summary of grand jury testimony prepared in furtherance of the alleged conspiracies.

---

1. Another search was conducted the same day at the Church's offices in Los Angeles, California. I am concerned here only with the propriety of the search conducted in the District of Columbia.

2. Affidavit in Support of Search Warrant at 32. The affidavit discusses these allegations in considerable detail.

The warrant directed the agents to leave no stone unturned. It identifies 148 documents and files allegedly stolen from government offices. It also lists as appropriate for seizure the summary of grand jury testimony and 12 other documents and categories of documents that the government apparently believes constitute evidence of the alleged conspiracies. Finally, item number 162 of the warrant authorizes the agents to seize:

> Any and all fruits, instrumentalities and evidence (at this time unknown) of the crimes of conspiracy, obstruction of justice and theft of government porperty [sic] in violation of 18 U.S. Code §§ 371, 1503 and 641 which facts recited in the accompanying affidavit make out.

While the FBI agents were conducting the search the Church filed a motion in this Court seeking to restrain them from doing so and to impose a protective order sealing all documents seized, primarily on the ground that the warrant was overbroad on its face in violation of the Fourth Amendment to the United States Constitution. The Church argued in addition that should the contents of some of the seized documents be disclosed to representatives of the numerous federal agencies with which it is presently involved in civil litigation, its attorney-client privilege would be violated and its litigation prospects irreparably damaged. This Court denied the motion without reaching the merits of the Church's contentions. On July 11 the Church renewed its request for a protective order; with the consent of the United States Attorneys responsible for the criminal investigation, an order was entered prohibiting disclosure of the seized materials to attorneys for or employees of agencies involved in civil litigation with the Church. The order was to remain in effect for ten days.

The Church has now moved for return of the property seized from its Washington files on July 8. Rule 41(e), Fed.R.Crim.P. In effect this is a motion to suppress. *Id.* The Church asserts four grounds for invalidating the seizure: The warrant was overbroad—or "general"—on its face; the agents conducted the search in a manner violative of the Fourth Amendment; the agents employed unnecessary force in violation of 18 U.S.C. § 3109; and any probable cause that might have been established by the affidavit had grown stale by the time it was executed.

■ Having considered the memoranda filed by representatives of the Church and of the government and heard their oral arguments with respect to the warrant's facial validity, I find I need go no further. I hold that the grant of authority to the agents to search for and seize any evidence of conspiracies to steal government property and to obstruct justice[3] amounted to a "general warrant" and therefore contravened the Fourth Amendment's guarantee against unreasonable searches and seizures. I am not persuaded that the Supreme Court's recent decision in *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), is to the contrary.

I

■ The Fourth Amendment to the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, *and particularly describing the place to be searched and the persons or things to be seized.* (emphasis added).

The Fourth Amendment serves to prevent both unjustified and arbitrary interferences with personal security and property.[4] In the first instance the amendment is de-

---

3. It should be noted that item 162 of the warrant appears to permit seizure of evidence of *any* conspiracy. I reject such a construction, however, in light of the emphasis in the affidavit on the two types of conspiracies I have mentioned.

4. *See generally* Amsterdam, *Perspectives On the Fourth Amendment,* 58 Minn.L.Rev. 349, 410–12 (1974).

signed to ensure that the government cannot interfere with a person's security unless it has a good reason for doing so. The *particularity* requirement ensures as well that the government cannot conduct a search indiscriminately, as by rummaging through a person's belongings in search of any evidence of any crime whatsoever. It accomplishes this end in two ways. First, it leaves to a neutral judicial officer the initial decision as to what can be seized.[5] Second, it circumscribes the permissible bounds of the search itself; as a commonly-used example illustrates, an officer executing a warrant could not reasonably expect to find a stolen elephant in a kitchen closet or in the drawer of a desk.

■ As particularity is required, so necessarily is generality forbidden. Opposition to the so-called "general warrant" has firm roots in the history of Anglo-American law. As Justice Stewart has observed, writing for a majority of the Supreme Court in *Stanford v. Texas*, 379 U.S. 476, 481–82, 85 S.Ct. 506, 509, 13 L.Ed.2d 431 (1965):

> These words [commanding a particularized description of the place to be searched and the persons or things to be seized] are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of

English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' The historic occasion of that denunciation, in 1761 at Boston, has been characterized as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child of Independence was born.' " *Boyd v. United States*, 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

Also it is significant, in considering the propriety of seizure of a Church's documents, that the First and Fourth Amendments share at least in part a common heritage.

> Historically the struggle for freedom of speech and press in England was bound up with the issue of the scope of the search and seizure power.

*Marcus v. Search Warrants*, 367 U.S. 717, 724, 81 S.Ct. 1708, 1712, 6 L.Ed.2d 1127 (1961). In fact, unlimited power to search was first directed at nonconforming religious groups.

> In Tudor England officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan.

*Stanford v. Texas, supra*, 379 U.S. at 482, 85 S.Ct. at 510.

I make reference to the First Amendment not to suggest that overtones of religious persecution attend the criminal investigation of the Church of Scientology, but to make clear the need for increased sensitivity in cases in which religious organizations are involved, irrespective of the nature or gravity of the charges against them.

---

5. The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is to be left to the discretion of the officer executing the warrant. *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).

*Cf. Stanford v. Texas, supra; Marcus v. Search Warrants, supra.*

■ The flaw I find in the warrant involved here is precisely the evil that inheres in general warrants. The warrant in this case authorized—if indeed it did not direct—agents of the FBI to examine carefully and completely the contents of every document in the fourth-floor files of the Church and to make ad hoc, on-the-spot decisions as to which of those documents constitute evidence of conspiracy—an amorphous and open-ended crime that, as discussed below, has since its conceptual inception perplexed commentators and courts alike. In my view this warrant—addressed as it is to the crime of conspiracy—invited the agents to seize any documents in the Church's files that struck their fancy. As the Supreme Court put it in another context in *Marcus v. Search Warrants, supra* : "The warrants gave the broadest discretion to the executing officers; they . . . left to the individual judgment of each of the many police officers involved the selection of such magazines as in his view constituted 'obscene publications.' " 367 U.S. at 732, 81 S.Ct. at 1716. In the present context as well, the sweep of that discretion is constitutionally intolerable.

## II

■ The government rests its case, and quarrels with the analysis presented above, primarily on the authority of *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). In fact, as counsel for the government has indicated, the warrant involved in this case was patterned after the one at issue in *Andresen*. As I have suggested, I do not believe that *Andresen* stands for the proposition that a warrant authorizing search for evidence of particular conspiracies comports with the particularity requirement of the Fourth Amendment. Nevertheless, *Andresen* closely resembles the present case in numerous respects and obviously must be examined here.

*Andresen* can best be understood in the light of the Supreme Court's earlier opinion in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). In *Warden* a majority of the Court joined in abandoning the so-called "mere evidence" rule, which had prohibited seizure of items having only evidential value as distinguished from contraband, fruits and instrumentalities of crime. *Warden* involved a "hot pursuit," *warrantless* search that culminated in retrieval not only of a robbery suspect, weapons, and ammunition he allegedly used, but also of clothing he allegedly wore during the robbery, found in a washing machine in the basement of his house. The Court was hard put, on the facts of that case, to draw distinctions in terms of interests the Fourth Amendment is designed to protect between the clothing, on the one hand, and the weapons and ammunition, on the other. Chief Justice Warren and Justice Fortas concurred in the result only, expressing apprehension that abandonment of the "mere evidence" rule was not only unnecessary but also likely to destroy the Fourth Amendment's prohibition against general searches. 387 U.S. at 310–12, 87 S.Ct. 1642. Justice Douglas dissented vigorously on essentially the same ground. *Id.* at 312–25, 87 S.Ct. 1642.

At the time of the Court's decision in *Warden*, despite some ambiguity it was generally assumed that the *Fifth* Amendment stood as a bar to *seizure* of an individual's personal papers, as well as to compelled *production* of such papers. *E. g.*, *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). *Warden*, however, expressly left open the question whether that was so. 387 U.S. at 303, 87 S.Ct. 1642.

The Supreme Court apparently determined to resolve much of this ambiguity in *Andresen*. It upheld a conviction for the crime of "false pretenses" as defined by Maryland law, *see* Md.Ann.Code, Art. 27, § 140 (1976), over petitioner's contentions that the Fifth Amendment barred seizure of his personal business records and that warrants authorizing searches for documents in his offices were unconstitutionally general. The warrants at issue directed seizure of certain specified "items pertain-

ing to sale, purchase, settlement and conveyance of lot 13, block T, Potomac Woods subdivision, Montgomery County, Maryland," 427 U.S. at 480 n. 10, 96 S.Ct. at 2488, "together with other fruits, instrumentalities and evidence of crime at this [time] unknown." *Id.* As does the Church here, Andresen based his "generality" argument on the catch-all phrase at the conclusion of each warrant. He contended, according to the Court, that the "other-fruits" clause permitted the executing officers to search for and seize evidence of any crime.

After rejecting petitioner's Fifth Amendment claim, for reasons not germane here, the Court began its Fourth Amendment analysis by reaffirming the rule that:

> General warrants, of course, are prohibited by the Fourth Amendment. "[T]he problem [posed by the general warrant] is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings. . . . [The Fourth Amendment addresses the problem] by requiring a 'particular description' of the things to be seized. *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). This requirement " 'makes general searches impossible and prevents the seizure of one thing under a warrant describing another. *As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.*' " *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965), quoting *Marron v. United States*, 275 U.S., at 196, 48 S.Ct., at 76.

*Andresen v. Maryland, supra*, 427 U.S. at 480, 96 S.Ct. at 2748 (emphasis added). The Court then stated that, taken in context, the

> challenged phrase must be read as authorizing only the search for and seizure of evidence relating to 'the crime of false pretenses with respect to Lot 13T.' . .

*Id.* (citation omitted). Since the warrants therefore "did not authorize the executing officers to conduct a search for evidence of *other* crimes," said the Court, they did not run afoul of the particularity requirement. *Id.* at 481–82, 96 S.Ct. at 2749 (emphasis added).

Petitioner in *Andresen* had a second Fourth Amendment claim, which pertained to documents referring to a lot other than 13T that were seized pursuant to a clause in the warrant authorizing search for "books, records, documents, papers, memoranda and correspondence, showing or tending to show a fraudulent intent, and/or knowledge as elements of the crime of false pretenses . . . ." *Id.* at 481 n. 10, 96 S.Ct. at 2748. Apparently he contended that these items were irrelevant to the charge concerning Lot 13T and therefore should have been suppressed according to *Warden v. Hayden, supra.* The Court disagreed, observing that intent to defraud is an element of the crime of false pretenses in Maryland and that it is well settled that "proof of similar acts is admissible to show intent or the absence of mistake." *Andresen, supra*, at 483, 96 S.Ct. at 2750. Moreover, said the Court,

> Lot 13T and the other lot [about which evidence was seized] had numerous features in common. Both were in the same section of the . . . subdivision; both had been owned by the same person; and transactions concerning both had been handled by petitioner. Most important was the fact that there were two deeds of trust in which both lots were listed as collateral.

*Id.* at 484, 96 S.Ct. at 2750.

### III

The government apparently would have me read *Andresen*, in conjunction with *Warden v. Hayden*, as sanctioning any warrant that directs the executing officers to search for "evidence of" a particular crime. The logic of the government's position is clear and, I admit, parallels statements made by the Court in *Andresen* : If the affidavit and warrant together identify in precise terms the crime believed to have been committed, and the warrant directs the agents to search for "evidence of" that crime, then the agents have no discretion to search for evidence of other crimes, and the particularity requirement is satisfied.

Were the government correct, the particularity requirement would be rendered a nullity. Hence I cannot believe that the Court intended *Andresen* to be interpreted so broadly, or so literally. For a warrant must satisfy *both* the probable cause and particularity commands, not simply the former: "[N]o Warrants shall issue, but upon probable cause [to believe a *particular* crime has been committed], . . *and* particularly describing the place to be searched and the persons or things to be seized." U.S.Const. amend. IV (emphasis added). To say that mechanical inclusion of the phrase "evidence of [a particular crime]" in a warrant automatically and necessarily renders it particular rather than general is to say, simply, that we no longer prohibit general searches.

To be sure, searches for "evidence of" crimes are no longer prohibited, and in *Andresen* the Court did validate a warrant authorizing just that. This in no way means, however, that the particularity requirement has been discarded along with the "mere evidence" rule; rather, the government can safely assume only that searches for *particular evidence* will be condoned. As the Court put it in *Warden*,

> if . . . rejection [of the "mere evidence" rule] does enlarge the area of permissible searches, the intrusions are nevertheless made after fulfilling the probable cause *and particularity* requirements of the Fourth Amendment
> . . . .

387 U.S. 309, 87 S.Ct. 1651 (emphasis added).

*Andresen* must, I believe, be read in the light of the Court's reiteration of our historical proscription of general warrants and the Court's statement, derived from numerous prior cases, that "*[a]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant.*" 427 U.S. at 480, 96 S.Ct. at 2748 (emphasis added). I do not take this statement literally to mean that the executing officer can make no determinations at all with respect to what is to be seized. Such an application of the Court's language would require me to ignore the rule permitting the executing officer to seize manifestly criminal objects such as contraband that he encounters inadvertently in plain view.[6] What I do take the Court to mean, however, is that a neutral and detached judicial officer must in the first instance ensure that strict standards exist to guide the officer in his exercise of discretion. Evidently the majority[7] of the Court was satisfied that the judicial officer who issued the warrant in *Andresen* could reasonably have concluded that a search for evidence pertaining to the sale of a specific parcel of real estate—precisely and unmistakably identified as "Lot 13T"— is sufficiently circumscribed to comport with the rule against discretionary searches and seizures. Presumably the agents could readily determine whether a particular document pertained to that lot simply by inspecting its contents in a cursory fashion— that is, by keying on the magic words, "Lot 13T." Thus they could instantly seize—or eliminate from their scrutiny—any document that on its face did not relate to that property.[8]

Try as the government might, the same cannot be said about a search for evidence of a conspiracy—irrespective of the preci-

---

6. *E. g., Alderman v. United States*, 394 U.S. 165, 177 n. 10, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (dictum); *see also* Amsterdam, *supra* note 4, at 358.

Whether documentary evidence in a person's files can be encountered "inadvertently" is a question that is sure to arise. I would have grave apprehensions about such an application of the "plain view" doctrine.

7. Justices Brennan and Marshall each wrote a dissenting opinion. 427 U.S. at 484, 96 S.Ct. 2737; *id.* at 493, 96 S.Ct. 2737.

8. I must admit that the Court's sanction of the seizure of evidence of "intent" or "absence of mistake" casts some doubt upon the issue involved here. However, the Court limited its sanction to evidence of similar transactions that related closely and objectively to Lot 13T, i. e. evidence pertaining to a second lot that was listed as collateral together with Lot 13T in two deeds of trust. 427 U.S. at 484, 96 S.Ct. 2737. In so doing, the Court appeared to be embracing the rationale I have espoused in the text.

sion with which the underlying substantive offense is described.[9] Indeed, because of the permissive rules of evidence available to prosecutors seeking to prove conspiracy, in this context especially the distinction the government urges between impermissible searches for evidence of *any crime* and permissible searches for evidence of a *particular crime* is patently hollow. For there is nothing "particular" about conspiracy. As counsel for the Church points out, perhaps the best known statement in our jurisprudence concerning the law of conspiracy was that of Justice Jackson in *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949):

> The modern crime of conspiracy is so vague that it almost defies definition. Despite certain elementary and essential elements, it also, chameleon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid. It is always 'predominantly mental in composition' because it consists of a meeting of minds and an intent.
>
> The crime comes down to us wrapped in vague but unpleasant connotations. It sounds historical undertones of treachery, secret plotting and violence on a scale that menaces social stability and the security of the state itself. . . .
>
> . . . . .
>
> [E]ven when appropriately invoked, the looseness and pliability of the doctrine present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case.

*Id.* at 446–47, 449, 69 S.Ct. at 720, 721. Inasmuch as conspiracy "almost defies definition," it is no surprise that the rules of evidence that pertain to it are loose and pliable as well. This is so principally because the underlying substantive offenses do not limit the scope of relevant evidence that might be introduced at trial. Rather,

evidence of conspiracy could also include evidence of *any* action taken by one of the accused confederates—no matter how trivial or manifestly innocuous on its face—that might somehow be connected to an agreement to commit the substantive offenses, or be said to constitute an act in furtherance of such an agreement. *See, e. g.*, Wharton, Criminal *Evidence*, § 642 (13th ed. 1973). Thus "evidence of conspiracy" is a virtually open-ended proposition.

■ It seems self-evident, then, in considering both the warrant and the affidavit supporting it, *see Moore v. United States*, 149 U.S.App.D.C. 150, 461 F.2d 1236, 1238 (1972), that the agents in this case had no clear standard to guide their exercise of discretion. Item 162 of the warrant authorized them to search for and seize "evidence at this time unknown" of the two conspiracies outlined in the affidavits. Such evidence, quite clearly, is of a character substantially different from the evidence involved in *Andresen*. In that case, subjective judgments by the officers as to what may or may not be evidence were narrowly confined by the *objects* of the search—documents pertaining to the sale of a specific parcel of real estate, precisely identified as "Lot 13T." Thus a search for "unknown evidence" pertaining to a single real estate transaction may be said to be particular in the sense that the agents know essentially what they are looking for, and definite limitations exist with respect to their exercise of discretion as to what to seize. In the present case, by contrast, despite the detail with which the alleged conspiracies to burglarize government offices, steal government property, and obstruct the criminal investigation are described in the affidavit, the potential fruits of the search were limited only by the number of documents in the Church's files. To be sure, the affidavit provided the agents with substantial guidance as to what to look for. But neither the warrant nor the affidavit—nor both construed together—placed practical limita-

---

**9.** In the present case, one of the underlying substantive offenses is obstruction of justice. That in itself is a rather amorphous crime, and

remains so despite the detail with which the alleged plot is described in the affidavit.

tions upon their determinations respecting what to seize. For unless the contents of any particular document rendered it manifestly criminal, the decision whether to seize it was complicated by the subjective considerations attending the law of conspiracy. In effect, each agent had been delegated authority to consider the relevance of the documents according to his own subjective standards as to what evidences the conspiracies suggested by the affidavit. As a practical matter, therefore, a directive to seize "evidence at this time unknown" of conspiracy is a "wild card" permitting seizure of anything at all. In terms of the damage done to the Church's interest in freedom from unjustified, indiscriminate seizures, item 162 is indistinguishable from a warrant to seize evidence of "any crime."

Under the circumstances of this case, the government's argument that the affidavit was sufficient to establish the necessary particularity is on especially tenuous ground. For the government concedes that "certain documents . . . should not have been seized," that indeed "approximately half of the documents will be returned . . ." Memorandum in Opposition To Motion For Return of Property at 4. Though, as the government suggests, the fact of improper *seizure* may not *ipso facto* demonstrate an improper *warrant*, that fact certainly provides strong indication that the agents themselves did not construe the affidavit as limiting their discretion.

 Moreover, even assuming *arguendo* that the government's broad interpretation of *Andresen* is the correct one, I would still find it difficult to condone a warrant authorizing search for and seizure of evidence of conspiracy "at this time unknown." For unless the warrant directed the executing officers to seize *only evidence objectively pertaining to specific acts of conspiracy identified in the affidavit* —as distinguished from evidence of any potential act in furtherance of the conspiracies described—the officers would maintain their license to rummage through the files and take whatever they pleased. Indeed, even a warrant authorizing search only for

unknown documents pertaining to specific acts of conspiracy would seem to suffer for want of particularity. Execution of such a warrant, again, would vest in the agents discretion to make difficult, subjective determinations with respect to relevancy. Thus I must admit that I have serious doubts whether any warrant authorizing search for and seizure of "documentary evidence of conspiracy at this time unknown" could withstand constitutional scrutiny.

## IV

 I recognize and share the Supreme Court's concern that the "complexity of an illegal scheme . . . not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession." *Andresen, supra*, 427 U.S. at 481 n. 10, 96 S.Ct. at 2749. At the same time, of course, a complex legal scheme cannot be used as a shield from the commands of the Fourth Amendment. Thus it may be said that a far-flung criminal scheme—such as conspiracy—*justifies* an equally far-flung search for evidence of that scheme. The Fourth Amendment, however, as the Court has repeatedly recognized, commands more than a justification for an intrusion into a person's privacy. It also commands that no such intrusion be executed in an *arbitrary*, or indiscriminate manner. Thus steps must be taken to ensure that the intrusion is confined to its justifiable limits. This is so especially where searches for documents are involved.

We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. . . . In both kinds of searches, responsible officials, including judicial officials, must take care to ensure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.

*Andresen,* 427 U.S. at 482 n. 11, 96 S.Ct. at 2749. This rationale, it seems to me, applies with still more force in a case involving a search through a religious organization's files.

 Once government agents have a search warrant in hand, only the requirement that the warrant "particularly describ[e] the place to be searched, and the persons or things to be seized" serves to protect citizens from unjustified interferences with personal security or property. The particularity requirement—and nothing else—confines the intrusion to its justifiable limits.[10] In *Andresen* the Supreme Court evidently believed that the precision of the term "Lot 13T" was sufficient to accomplish that purpose. Here, however, there is no such precision. This is why the warrant cannot stand.

---

**10.** Had the warrant authorized only seizure of items one through 161, for example, the resulting interference with the Church's privacy would have been narrowed considerably. First, the agents could have removed from the Church's files only the items listed specifically in the warrant. Second, specification of the things to be seized would have altered the search-process itself. Each of the specified items has certain objective, readily identifiable earmarkings—name of author or addressee, date, title and the like. Thus in one respect or another each item is similar to a document pertaining to "Lot 13T." Presumably the Church has imposed some system of order on its files, most likely by alphabetizing them. The agents, then, could first have looked in the specific sections of the files in which the documents would most likely be found. If perchance the agents succeeded immediately in locating the documents sought, no justification would have existed to search further, and no other documents could have been disturbed. Assuming the files had no order whatever or the specified items were randomly interspersed throughout them, the agents could have inspected each document in the files in cursory fashion, keying on the objective earmarkings specified in the warrant. Thus the agents would not have had authority to consider and take with them those secrets of the Church which should have been left alone.