**UNITED STATES**

v.

**Arthur Abraham PEISNER, Morris Disman.**

**Crim. A. No. 24744.**

United States District Court
D. Maryland.
Sept. 26, 1961.

Joseph D. Tydings, U. S. Atty., and John R. Hargrove, Asst. U. S. Atty., Baltimore, Md., for the Government.

Joseph J. Lyman, Washington, D. C., for defendants.

R. DORSEY WATKINS, District Judge.

### Questions Presented

On motion of defendants, jointly indicted for violation of U.S.C. Title 18, section 1465, by knowingly, unlawfully and feloniously causing to be transported in interstate commerce, from Maryland to New Jersey for the purpose of sale and distribution, 1560 paper-bound books, containing obscene, lewd and lascivious material, the matter was removed to this court under the provisions of Rule 21(b) of the Federal Rules of Criminal Procedure, 18 U.S.C. Motions to dismiss the indictment and for inspection of the minutes of the indicting Grand Jury were orally denied by this court. A motion for return of property and to suppress evidence was filed by defendant Peisner, defendant Disman joining in the motion to suppress, and evidence with respect thereto was taken on two days, followed by oral argument. Briefs in support of, and in opposition to, said motion have been filed. Incident to the motion is the question raised, argued and briefed, whether or not the United States is required to disclose the name of the informer on the basis of whose tip was begun the investigation out of which the instant proceedings arose.

### Facts

Long before the initiation of the instant case, the defendant Peisner had been the object, or subject, of investigation by various authorities as one engaged in the purveying of obscene literature. Accordingly, as background material, it appears that in 1957 a complaint was made to the F.B.I. with respect to the alleged possession and handling of obscene motion picture film by defendant Peisner. An investigation was begun by the F.B.I. and defendant Peisner was interviewed in the early part of 1958. Nothing warranting criminal proceeding was apparently developed.

Shortly thereafter, during an investigation of persons believed by the F.B.I. to be engaged in the manufacture and sale of obscene literature, the F.B.I.

learned that the defendant Peisner was associated with these persons, and concluded that he was engaged in the same business. These other persons were David Lerner, his brother Bernard Lerner, and Anthony Carbo. The Lerners had been convicted in the District of Columbia of possession and sale of obscene literature, although their convictions were later reversed, on the ground that the defendants' motion to suppress the evidence should have been granted because the search warrants had been issued without probable cause. Lerner v. United States, D.C.Mun.App.1959, 151 A.2d 184.[1]

On May 31, 1958, a Deputy Chief of the Metropolitan Police Department, Washington, D. C. visited an office in the District in response to a complaint that obscene literature had been observed in the hallway of that building. The complaining party also stated that he had heard a printing press running during that and other days, and that two men were occupying the premises. Investigation by this Deputy Chief developed that two men had taken a printing press down in the elevator and removed it from the building on the day he made his investigation. A building employee identified photographs of defendant Peisner and David Lerner as the men he had observed moving a printing press that day. Further investigation disclosed that the printing press had been moved from an office leased to defendant Peisner, listed as, and in fact, an attorney.

In his investigation of the vacated office, the Deputy Chief found scraps of pages from what he considered to be obscene books, and a set of plates for the printing of a book entitled "Kosimo's Wife", also considered to be obscene. This information, and these scraps of paper and plates, were furnished to the F.B.I.

In October 1958, the F.B.I. received information, or a "tip", that defendant Peisner was expected to transport obscene literature from Maryland to New York City on the weekend of October 31 —November 1, 1958, or the following weekend. This informant had on previous occasions given reliable information to the F.B.I. concerning similar matters, although a tip as to an earlier transportation by defendant Peisner had not materialized.

As a result of this tip the F.B.I. caused a surveillance of Peisner's home in Silver Spring, Maryland to be made just before November 1, 1958. On that date, at approximately noon, an F.B.I. agent observed both defendants loading some packages wrapped in plain brown paper and sealed with gum tape, into defendant Peisner's 1954 green Buick, which was parked in front of the Peisner residence. After some nine packages had been loaded, an automobile titled in the name of David Lerner's wife arrived, and Lerner helped the two defendants load additional packages into Peisner's Buick. At about 1:40 P.M. the two defendants left, driving toward Baltimore. On the way, they stopped in Catonsville, Maryland, for several hours, where defendant Peisner removed a package entirely different in appearance from those mentioned above. This material, and intermission, were entirely innocent in character. Thereafter, defendants drove to a point near the 300 block West Baltimore Street, out of the direct route for traffic bound for New York, and entered a book store in this block. From past investigations the F.B.I. knew this as a place the proprietor of which had been arrested for, and one of his clerks convicted of, the sale of obscene literature and pictures, in 1957 or 1958.

After leaving this book store, defendants drove north on Route 40, stopping at Aberdeen, Maryland for dinner at about 7 P.M. Thereafter they left the main road, taking many unmarked side roads and making "U" turns for about one-half hour, suddenly slowing and increasing speeds. As a result, the following F.B.I. auto lost contact, but this was re-established when the Peisner automobile returned to Route 40 north of the Susque-

---

1. Carbo had purchased for a paid police informer certain obscene material.

hanna River Bridge. It then proceeded on Route 40 through Delaware across the Delaware Memorial Bridge into the New Jersey Turnpike, where it was stopped at milepost 15 by the New Jersey Turnpike Police.

On October 31, and November 1, 1958 the Baltimore office of the F.B.I., in charge of the case, communicated information to the Newark office of the F.B.I., and asked that that office "alert" the New Jersey State Police.[2] The Newark office in turn communicated by telephone with the branch of the New Jersey State Police in charge of the New Jersey Turnpike. The information given was that an obscene literature carrier was en route from Baltimore to New York; Peisner's name was given, and a description of his Buick automobile; that the F.B.I. had been interested in these people for a considerable period of time and had very good reason to believe that obscene literature was then in the car enroute to New York, and that some agents of the F.B.I. had watched the material being loaded into the car. A description of Peisner and his automobile, and a statement that it was supposed to contain obscene literature, was relayed to the uniformed personnel on the Turnpike.

The Buick automobile containing the two defendants was stopped, on the Turnpike by a uniformed Turnpike policeman, partly because of the alert, and partly because of a traffic violation.[3] The policeman went to the driver's side and asked for the driver's license and registration. While he was talking, he noticed some packages and loose books in the back of the automobile; asked the occupants to get out of the car; reached in the car, picked up a book, read a paragraph or two, and then informed the de-

fendants that they were under arrest for possession of obscene literature.

The defendants were taken to the State Police Station, and the Newark office of the F.B.I. was notified. Agents promptly came to the Police Station, examined the literature, talked to a representative of the United States Attorney's office in New Jersey and on his authorization and with the consent of the New Jersey police took the defendants into custody, and the next morning appeared before a United States Commissioner and executed affidavits upon which arrest warrants were issued. On November 10, 1958, a "probable cause" hearing was had before the United States Commissioner, at the conclusion of which the Commissioner refused to quash the warrants.

## Discussion

A. The validity of the search.

In Elkins et al. v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 80 S.Ct. 1453, 4 L.Ed.2d 1669, a majority of the court held that evidence obtained by state officers during a search which, if conducted by federal officers, would have been unreasonable under the Fourth Amendment, was inadmissible over timely objection in a criminal trial in a federal court, even although there had been no participation by federal officers in the search and seizure. The court concluded (364 U.S. at pages 223–224, 80 S.Ct. at page 1447):

> "For these reasons we hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's

2. The Baltimore office asked the Newark office to request the New Jersey State Police "to stop the car." Based on the testimony of the Newark agent, and a sergeant of the New Jersey State Police, I find as a fact that no such request was made, and that the New Jersey State Police "went about it in exactly the same manner as * * * if we were prosecut-

ing under State statutes or considered it as a State case." Transcript, page 151.

3. "Careless driving.. * * * Wavering on the roadway; driving slow at this time, which could result in a careless driving * * * charge. It is in the statutes." Transcript, pages 170–171.

timely objection in a federal criminal trial.[16] In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry * * * The test is one of federal law * * *." [4]

■ Under this test, the court is of the opinion that the search and seizure herein were not unreasonable.

1. Applying literally the text "evidence obtained by state officers during a search *which, if conducted by federal officers*, would have violated the defendant's immunity", there can be no question but that the search was valid. The information possessed by the F.B.I., outlined above—Peisner's associations with others in the business; the removal of the printing press from the neighborhood of obscene printing and plates; the adventitious arrival of Lerner and his assistance in loading the packages; the deviation from the direct route to visit a suspect book store; the elusive driving —were adequate to constitute probable cause to believe, after the crossing of the Maryland line, that a felony was being committed, and to authorize an arrest and search, or a search and arrest, by the F.B.I.[5]

2. If the quoted language from Elkins is to be read as meaning "during a search which, if conducted by federal officers [acting with only the information possessed by the state officers], would have violated the defendant's immunity", the result is the same.

a. The facts given to the New Jersey State Police by the F.B.I. Newark office —the identification of Peisner and his automobile; the prior interest of the F.B.I. in Peisner, and the observation of the loading of the packages—could constitute probable cause for the belief by the New Jersey State Police that a state offense was being committed.

b. Quite possibly a simple statement by the F.B.I. to the New Jersey authorities that the F.B.I. believed the defendants to be engaged in the transportation of obscene literature would have constituted probable cause for action by New Jersey. There was testimony that the New Jersey police regarded the information from the F.B.I. as "a police alarm, exactly like a teletype alarm or a radio alarm for any agency which we would know. I went about it in exactly the same manner as I would if we were prosecuting under State statutes or considered it as a State case"; and that the information received from the F.B.I. was "sufficient for" New Jersey.[6]

■ 3. Search of a moving vehicle, without a warrant and not incident to a previous arrest, is permissible if there be probable cause. Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Husty v. United States,

---

4. Footnote 16 reads as follows:
"16. See Rule 41(e), Fed.Rules Crim. Proc. The defendant, of course, must have 'standing' to object. See Jones v. United States, 362 U.S. 257 [80 S.Ct. 725, 4 L.Ed.2d 697]."

5. Why the arrest was not made by the F.B.I. directly is somewhat speculative. No stops were made in Delaware. The evidence is quite clear that New Jersey attempts to discourage arrests on the Turnpike by any other than Turnpike policemen, uniformed and in marked cars. Disapproval had been voiced at arrests or stopping of cars on the Turnpike by the F.B.I., and even by regular New Jersey State Police.
   It is at least conjectural that the F.B.I. was interested in the identity of the potential purchaser.

6. It is not without significance that under New Jersey law the vehicle could properly have been stopped merely for a routine examination of operator and registration cards. Actually the stopping was partly because of a traffic violation. Having properly stopped the vehicle, the Turnpike police officer then, without any entry, observed in the back of the car several loose books and numerous packages, unusual both as to number and appearance. What he observed, coupled with the information previously relayed to him, not only indicated but justified or perhaps required a search and seizure. Petteway v. United States, 4 Cir., 1958, 261 F.2d 53, 54; see also Henry v. United States, 1959, 361 U.S. 98, 104, 80 S.Ct. 168, 4 L.Ed.2d 134; Haerr v. United States, 5 Cir., 1957, 240 F.2d 533, 535.

1931, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629; Scher v. United States, 1938, 305 U.S. 251, 255, 59 S.Ct. 174, 83 L.Ed. 151; Brinegar v. United States, 1949, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; Ray v. United States, 4 Cir., 1958, 255 F.2d 473, 475; United States v. Hayden, D.C.D.Md.1956, 140 F.Supp. 429, 432.

The Carroll, Brinegar and Ray cases have been so often cited and quoted that an analysis of their underlying facts would be supererogation. Suffice it to say that in the court's opinion the facts found in those cases to constitute probable cause were no stronger than, if as strong as, those known to the F.B.I., and those disclosed to New Jersey, in this case.

It is unnecessary to determine whether defendant Disman is a person "aggrieved" within the meaning of Rule 41(e) F.R.Cr.P., or one "legitimately on premises where a search occurs" who "may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him", Jones v. United States, 1960, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697, in view of this court's ruling that the search was valid.

B. Nondisclosure of "informer's" name.

■ Defendants urge that the Government was obligated to disclose the "informer's" name, both in connection with the probable cause phase, and in order to permit defendants properly to prepare for trial.

1. The only use made by the F.B.I. of the information they received about a probable trip was to place defendant Peisner's home under "surveillance." They already had the information as to his activities set forth above; they observed Lerner's assistance in loading the parcels; they followed Peisner's Buick automobile, and observed the route taken by it, the call at the Baltimore book store, the manner of driving, and the crossing of state lines. The tip merely triggered action, and of itself is insignificant on the question of probable cause.

Baysden v. United States, 4 Cir., 1959, 271 F.2d 325, is not in point. Apart from the question whether that case, dealing with the sufficiency of affidavits based purely on hearsay from an undisclosed informer, is relevant to a determination of probable cause after a search without a warrant, in Baysden the complaining officers knew nothing, in addition to the informer's information, except that crimes were being committed in the vicinity. Here, the F.B.I. had, or obtained, none of its information from the "informer" except as to a potential time element.

Pertinent, however, is the recognition in Baysden that the standards applicable to searches without warrant of "vehicles capable of swift movement" are different from those "where a search warrant was available and readily procured but was issued without observing the legal requirements." 271 F.2d at pages 328–329.

2. Roviaro v. United States, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639, is principally relied upon by defendants as requiring the disclosure of the "informer's" identity as "relevant and helpful to the defense of an accused, or * * * essential to a fair determination of a cause * * *." 353 U.S. at pages 60–61, 77 S.Ct. at page 628. But in Roviaro, the informer "had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged." 353 U.S. at page 55, 77 S.Ct. at page 625. He "took part in the transaction"; "His testimony might have disclosed an entrapment"; he was "the sole participant, other than the accused, in the transaction charged." He was "the only witness in a position to amplify or contradict the testimony of government witnesses." 353 U.S. at page 64, 77 S.Ct. at page 630.

None of these quotations is applicable to the role of the informer here. He was "an informer and nothing more." Miller v. United States, 5 Cir., 1960, 273 F.2d 279, 281, certiorari denied 1960, 362 U.S. 928, 80 S.Ct. 756, 4 L.Ed.2d 747. See also: United States v. One 1957 Ford Ranchero Pickup Truck, 10 Cir., 1959, 265 F.2d 21, 26; Jones v. United States, D.C.Cir.,1959, 271 F.2d 494, certiorari denied 1960, 362 U.S. 944, 80 S.Ct. 809, 4 L.Ed.2d 771.

The motion to suppress the evidence, and to disclose the name of the informer, is denied.