UNITED STATES of America,
Appellee,

v.

Arthur Abraham PEISNER and Morris
Disman, Appellants.

No. 8543.

United States Court of Appeals
Fourth Circuit.

Argued June 5, 1962.

Decided Nov. 5, 1962.

───

3. § 6672, 26 U.S.C. § 6672 (1958 ed.).

Joseph J. Lyman, Washington, D. C., for appellants.

J. Edward Davis, Asst. U. S. Atty. (Joseph D. Tydings, U. S. Atty., and Stephen H. Sachs, Asst. U. S. Atty., on brief), for appellee.

Before BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges.

BOREMAN, Circuit Judge.

Arthur Abraham Peisner and Morris Disman were jointly indicted for transporting in interstate commerce, for the purpose of sale and distribution, 1560 paper-bound books containing obscene, lewd and lascivious material, in violation of 18 U.S.C. § 1465 (1958). The case was removed from the District Court in the State of New Jersey, where defendants were arrested and indicted, to the District of Maryland under Rule 21(b), Federal Rules of Criminal Procedure. Defendants were tried and convicted by the District Court sitting without a jury. We think the judgments of conviction cannot be upheld.

Challenged on appeal is the constitutional validity of a search of Peisner's automobile in the course of which search evidence on which the convictions are based was discovered and seized. Also challenged is the legality of the defend-

ants' arrests following the search.[1] The search and arrests were without warrants. The District Court's opinion denying defendants' pretrial motion to suppress the seized evidence is reported at 198 F.Supp. 67. Since defense counsel stated at the bar of this court that the District Judge's finding that the transported materials are obscene is not challenged, we proceed on the assumption that the materials found in Peisner's automobile are obscene, lewd and lascivious within the meaning of the statute.

For many months prior to the actual arrest of these defendants, Peisner had been under investigation by the Federal Bureau of Investigation as a suspected purveyor of obscene literature. During the latter part of 1957 the Bureau received a complaint that Peisner possessed and handled an obscene motion picture film. In early 1958 Peisner was interviewed by the FBI with respect to this complaint and, a short time thereafter, the Bureau determined as a result of its investigation that Peisner was connected with certain individuals (David Lerner, his brother Bernard,[2] and Anthony Carbo) in the manufacture and sale of obscene materials.

On May 31, 1958, Deputy Chief Blick of the Metropolitan Police Department, Washington, D. C., investigated a complaint that obscene literature had been found in the hallways of a certain building in Washington. He visited the building and learned in the course of his investigation that during that day a printing press had been in operation on the premises. It developed that the offices examined by Blick were leased to Peisner though they were apparently unoccupied at the time of the search. Blick found in Peisner's vacated quarters some scrap pages on which were printed obscene passages, and a set of printing plates for a book entitled "Cosimo's Wife." Copies of this book, referred to by the District Court as "Kosimo's Wife," were later found with other paperbound books in Peisner's car on November 1, 1958, all of which were thereafter determined at trial by the District Court to be obscene. Blick's investigation further revealed that before his arrival at Peisner's offices, a printing press had been removed by two men who were identified from photographs by the building's elevator operator as Peisner and David Lerner. All of this information, the plates and scrap pages were turned over to the FBI.

In late October 1958, the FBI received information from an informant, who was considered by the agents to be reliable because of previous "tips" which had proved to be accurate, that Peisner was planning to transport some obscene materials from his home in Silver Spring, Maryland, to New York City for sale in the latter place and that the trip was to be made on the week end of October 31, 1958, or the one following. The Government refused defendants' repeated requests that the identity of the informant be disclosed and the District Court held that the Government need not make such disclosure.

Prior to October 31, FBI agents had been making "spot checks" of Peisner's house but these were discontinued on Saturday, November 1, and the house was placed under constant surveillance. On that day the watching agent saw the defendants, Peisner and Disman, load certain packages or cartons wrapped in brown paper into Peisner's 1954 green Buick, which was then parked in front of Peisner's residence. After nine such packages had been placed in the car, David Lerner arrived by automobile at the Peisner house and assisted defendants in loading the remainder of the packages into the Buick. Shortly after

[1]. Defendants argue in their brief in this court that the search followed the arrests but in the District Court they took the position that they were taken into custody after the search. The record supports the position taken in the District Court.

[2]. The District Judge noted that the Lerners had been convicted in the District of Columbia of possession and sale of obscene literature although their convictions were reversed because illegally obtained evidence was used against them.

two o'clock in the afternoon, Peisner and Disman left the former's residence traveling toward Baltimore in the Buick. Their first stop, entirely innocent in character, was at Catonsville, Maryland. After leaving that area, they drove into Baltimore City and were seen to enter and later leave a bookstore there.[3] In 1957 or 1958 the proprietor of this store had been arrested for, and one of the clerks had been convicted of, purveying obscene literature and pictures, which facts were known to the FBI. At about seven o'clock in the evening the defendants, who had been driving north on Route 40, stopped at Aberdeen, Maryland, for dinner and at that time an FBI agent observed that the packages were still in the Buick. Upon resuming travel, rather than continuing on Route 40, the main highway, the Peisner vehicle followed a course of unmarked side roads. The manner of driving supports the strong inference that they were attempting to elude anyone who might be following. For about half an hour the Buick, after sudden increases in speed, would suddenly slow down and numerous "U" turns were made. This unusual and erratic vehicular movement forced the FBI automobile which was following to drop farther and farther behind until surveillance of the Buick was no longer possible. The FBI later picked up the trail when the Peisner vehicle re-entered Route 40 a considerable distance north of the place where it left the highway. Defendants then proceeded on Route 40 through Delaware, across the Delaware Memorial Bridge and onto the New Jersey Turnpike where they were soon stopped by a member of the New Jersey Turnpike Police. The officer approached the car and asked Peisner, who was driving, for his driver's license; simultaneously, the officer flashed the beam of his flashlight into the car and noticed several wrapped packages on the rear seat and floor and a few loose books on top of the packages. The officer testified that the packages and loose books were seen from outside the car. Upon request, defendants got out and moved to the rear of the automobile, whereupon the officer reached into the car and removed a book. He then and there read briefly from the book and informed defendants that they were under arrest for possession of obscene literature. Defendants were taken to a nearby police barracks where they were later taken into custody by the FBI.

It was established that the FBI office in Newark, New Jersey, had been advised by the FBI office in Baltimore of Peisner's identity and that of his car, as well as the reason of the Bureau for its interest in him. The Newark office was advised also of the spot checks of the Peisner residence and the Baltimore agents' belief that Peisner was contemplating the interstate transportation of obscene literature during the week end of October 31, 1958. On November 1 the Baltimore office notified the Newark office that Peisner was proceeding in a 1954 green Buick toward New Jersey and that it had reason to believe that he was transporting obscene material. The Newark office relayed this information to the New Jersey State Police. There is testimony by an agent in the Baltimore office that he instructed the Newark office to request the New Jersey police to arrest Peisner and his companion on the Turnpike, but apparently this instruction and request did not reach the trooper who actually made the arrest. This officer testified that he had been told to be on the lookout for a car such as Peisner's containing obscene materials, but in his recital of the instructions given him he made no reference to a request to make an arrest. It was shown that the Turnpike authorities view with disfavor the stopping of automobiles on the Turnpike by anyone other than uniformed members of the Turnpike police force who travel in marked cars. This explains the FBI request that the New Jersey police make the arrests. Though the trooper who actually made the arrests

---

3. It was testified at the trial that Peisner offered to sell "books" to this store but the offer was refused.

testified that the Peisner vehicle was being operated in an unlawful manner at the time it was stopped, no traffic violation was cited as the reason for the arrests, and it appears that the search, seizure, and arrests were made, at least in substantial part, because of the information furnished by the FBI. In fact, the arresting officer admitted that, acting on the information which he had, he stopped several other vehicles prior to stopping the Peisner car.

All law enforcement officials should keep constantly in mind the familiar words of the Fourth Amendment, not only that innocent persons may be protected, but also to make certain that persons who are clearly guilty of crime may be convicted and the convictions upheld. Those words which overzealous officers, no doubt acting in good faith, too often ignore or forget, are as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The effect, nature and extent of that Amendment, as well as the duties of courts to secure to the citizenry the protection it affords and guarantees, are set forth in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Defendant Weeks was convicted of using the mails for the purpose of transporting certain coupons or tickets representing chances or shares in a lottery or gift enterprise. He had been arrested without a warrant at his place of business, and his residence was twice searched by police officers without a search warrant. During the searches, certain papers, letters and other articles were seized and some of them were later introduced in evidence against him. The Court held that the search and seizure violated the Fourth Amendment and that the evidence thus acquired should have been suppressed. In the course of its opinion, the Court stated, 232 U.S. at 391–392, 34 S.Ct. at 343–344, 58 L.Ed. 652:

"The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions, the latter often obtained after subjecting accused persons to unwarranted practices destructive of rights secured by the Federal Constitution, should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.

\* \* \* \* \* \*

" \* \* \* The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. \* \* \* " Id. at 393, 34 S.Ct. at 344, 58 L.Ed. 652.

Prior to Weeks, however, the Supreme Court, in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), recognized a distinction between the search for and seizure of (1) stolen goods or goods liable to the payment of

duties and concealed to avoid such payment and (2) a man's private books and papers for the purpose of obtaining information therein contained or of using them as evidence against him. "In the one case, the government is entitled to the possession of the property; in the other it is not." Id. at 623, 6 S.Ct. at 528, 29 L.Ed. 746. In Boyd, a civil case involving the forfeiture of imported goods on which the customs duties had allegedly not been paid, the issue was whether the Government could compel the defendant to produce certain documents which, when introduced in evidence, would tend to incriminate him. The statute authorizing a court order requiring production of the documents was confessional in character in that if defendant refused to produce the documents listed in the order, the prosecution was authorized to treat as confessed or admitted such facts as were expected to be proved from the documents themselves. The Supreme Court found the statute and its authorized procedures repugnant to the Fourth and Fifth Amendments.

Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), reiterated the lessons taught by Boyd and Weeks and held that search warrants may not be used to gain access to a man's house or office and papers solely for the purpose of making a search to secure evidence to be used against him in a criminal proceeding, and may be resorted to only when a primary right to such search and seizure may be found in the interest which the public may have in the property to be seized, or in the right to possession of it, or when a valid exercise of the police power renders possession unlawful and provides that it may be taken. "There is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure, *if only they fall within the scope of the principles of the cases in which other property may be seized, and if they be adequately described in the affidavit and warrant.*" (Emphasis

ours.) Id. at 309, 41 S.Ct. at 265, 65 L.Ed. 647.

In Go-Bart Importing Co. v. United States, 282 U.S. 344, at page 357, 51 S.Ct. 153 at page 154, 75 L.Ed. 374 (1931), the Court stated, referring to the Fourth Amendment:

"The second clause declares: 'and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' This prevents the issue of warrants on loose, vague or doubtful bases of fact. It emphasizes the purpose to protect against all general searches. Since before the creation of our government, such searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the constitutions or statutes of every State in the Union. * * * The need of protection against them is attested alike by history and present conditions. The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted. * * *"

█ It is well settled, however, that the Amendment does not prohibit all searches and seizures but only those that are unreasonable. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In 267 U.S. at page 149, 45 S.Ct. at page 284, 69 L.Ed. 543, the Court stated the rule governing the seizure without a warrant of contraband goods in the course of transportation and subject to forfeiture or destruction as follows:

"On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle

contains that which by law is subject to seizure and destruction, the search and seizure are valid. The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens."

■ However, it must be remembered that the standard of probable cause to support a search without a warrant is no less stringent than the standard of probable cause required to support the issuance of a search warrant. As stated in Henry v. United States, 361 U.S. 98, 104, 80 S.Ct. 168, 172, 4 L.Ed.2d 134 (1959), "The fact that the suspects were in an automobile is not enough. Carroll v. United States, supra, liberalized the rule governing searches when a moving vehicle is involved. But that decision merely relaxed the requirements for a warrant on grounds of practicality. It did not dispense with the need for probable cause." See also Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Ray v. United States, 255 F.2d 473 (4th Cir. 1958).

Defendants contend that where books or publications are the object of a police search, a more stringent standard of probable cause for the search is required than where other items of property are the object of such search. This is so, they say, because the prohibitions of the Fourth and First Amendments to the Constitution must be considered together in the protection of persons from searches for or seizures of publications which would constitute unwarranted invasions of privacy (Fourth Amendment) and inhibit the free flow of protected expression (First Amendment).[4] Defendants further contend that, in order to validate the search, seizures and arrests here involved, there must have been a prior *judicial* determination of the obscenity of the transported publication.

■ We are here first concerned with the constitutional safeguards designed to protect individuals from prohibited unreasonable searches and seizures of their "persons, houses, papers and effects." The term "effects" is broad enough in scope to include automobiles or books which might be transported therein. The Fourth Amendment is sufficiently broad to afford protection to all property, even though it may be contraband of any type or obscene in nature, against *unreasonable* searches and seizures.

■■ It may well be said that, absent consent of one in position to give consent, every warrantless search and seizure by a police officer is *prima facie* unreasonable unless and until there is a clear showing that, prior to the search, the officer had good reason to believe that property properly classified as contraband was contained in the place to be searched. Because of the protection afforded by the First Amendment, most books or other publications (excepting, for example, books stolen or illegally imported) cannot be properly classified as contraband. Of course, *obscene material* is contraband under the statute prohibiting interstate transportation thereof (18 U.S.C.A. § 1465). The Supreme Court has expressly excluded *obscene* publications from the protection of the First Amendment.[5] Standing alone, probable cause to believe that books or other publications are being transported in interstate commerce is not sufficient to support a search and seizure; there must be, in addition, probable cause to believe that the books or other publications being so transported are obscene, lewd and lascivious.

---

4. The provisions of the Fourth Amendment have been fully set out, supra, in this opinion. The pertinent portion of the First Amendment is as follows: "Congress shall make no law * * * abridg-

ing the freedom of speech, or of the press; * * *."

5. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

The fact that contraband is discovered during a warrantless search is not enough to support such search without probable cause.[6] A search is not to be made legal "by what it turns up. In law it is good or bad when it starts and does not change character from its success."[7] "Nor is it material that the search was successful in revealing evidence of a violation of a federal statute. A search prosecuted in violation of the Constitution is not made lawful by what it brings to light; * * *."[8]

In brief and argument the defendants rely most heavily upon Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). Extended discussion thereof is deemed appropriate.

The pertinent facts in Marcus are that a police lieutenant, following certain statutory procedures of Missouri as supplemented by a rule of the Supreme Court of that state, after investigating the distribution of alleged obscene materials in Kansas City, took a list containing the titles of five publications to a magazine distributor and was informed that the distributor sold all but one of the listed magazines. The following day the lieutenant visited five newsstands and purchased one magazine from each.[9] Soon thereafter, he signed and filed six complaints in the state court stating in each that "of his own knowledge" the party named therein, at a stated place of business, "kept for the purpose of [sale] * * * obscene * * * publications." No copy of any magazine on the lieutenant's list or of any of the publications purchased by him was attached to the complaints or shown to the state judge who later, acting solely on the basis of the complaints, issued six search warrants authorizing (as to each of the five newsstands and the distributor) "any

peace officer in the State of Missouri * * * [to] search the said premises * * * within ten days after the issuance of this warrant by day or night, and * * * seize * * * [obscene materials] and take same into your possession * * *." All the warrants were executed on the day following their issuance but by different police officers of whom the lieutenant who made the complaints was one. The officers, in executing the warrants, examined publications in the respective places of business without confining themselves to the magazines on the lieutenant's original list. Each of the officers seized all the copies of the magazines which, in his judgment, were obscene. Approximately 11,000 copies of 280 publications were seized and hauled away from the six places within a period of about three hours. Subsequently the state judge, after a hearing, determined that 100 of the seized titled publications were obscene and that the remaining ones were not obscene. An order was entered directing the return of the nonobscene publications to their respective owners and the retention of the obscene for criminal prosecution purposes.

The Supreme Court held, in Marcus, that these search and seizure procedures lacked the safeguards to nonobscene material which the Due Process Clause of the Fourteenth Amendment requires to prevent erosion of the constitutional guarantees of freedom of speech and press; that under the Fourteenth Amendment a state is not free to adopt whatever procedures it pleases for dealing with obscenity without regard to the possible consequences for constitutionally protected speech; that the procedures, as there applied, confided to law enforcement officials broad discretion to seize allegedly obscene publications without

---

6. Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

7. United States v. Di RE, 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948).

8. Byars v. United States, 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520 (1927).

9. He purchased a copy of the same magazine at three of the stands, a copy of another edition of this magazine at a fourth stand, and a copy of one other magazine at the fifth stand.

adequate safeguards to assure nonobscene material the constitutional protection to which it is entitled.[10]

Marcus is clearly distinguishable on its facts from the case at bar. It is distinguishable also in that the Court was there called upon to consider and apply the Due Process Clause of the Fourteenth Amendment, whereas we must determine the application of the Fourth Amendment to the factual situation here presented. Common to both cases, however, is the consideration of the First Amendment guarantee of a free press and the relationship of that guarantee to other provisions of the Constitution. We consider relevant here the Court's observations and conclusions in Marcus with respect to the protection afforded printed matter by the First Amendment and the holding that the First and Fourteenth Amendments must be considered together.

Also, particularly applicable here are the words of Mr. Justice Clark in Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961):

" * * * The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence. Cf. Rochin v. California, 342 U.S. 165, 173 [72 S.Ct. 205, 96 L. Ed. 183] (1952)."

In Manual Enterprises, Inc. v. Day, 370 U.S. 478, 518, 82 S.Ct. 1432, 1453, 8 L.Ed.2d 639 (1962), the Supreme Court warns "that the necessity for safeguarding First Amendment protections for nonobscene materials means that Government 'is not free to adopt whatever procedures it pleases for dealing with obscenity * * * without regard to the possible consequences for constitutionally protected speech.' Marcus v. Search Warrant, 367 U.S. 717, 731 [81 S.Ct. 1708, 6 L.Ed.2d 1127]." [11]

Though it has been determined that "obscenity" is not within the area of constitutionally protected speech and press, the complexity of the test of "obscenity" fashioned by the Supreme Court in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, serves to em-

10. Explanatory of the constitutional deficiencies in Marcus the Court, at 367 U.S. 732–733, 81 S.Ct. 1716–1717, 6 L.Ed. 2d 1127, said: " * * * The warrants gave the broadest discretion to the executing officers; they merely repeated the language of the statute and the complaints, specified no publications, and left to the individual judgment of each of the many police officers involved the selection of such magazines as in his view constituted 'obscene * * * publications.' So far as appears from the record, none of the officers except Lieutenant Coughlin had previously examined any of the publications which were subsequently seized. It is plain that in many instances, if not in all, each officer actually made ad hoc decisions on the spot and, gauged by the number of publications seized and the time spent in executing the warrants, each decision was made with little opportunity for reflection and deliberation. As to publications seized because they appeared on the Lieutenant's list, we know nothing of the basis for the original judgment that they were obscene. It is no reflection on the good faith or judgment of the officers to conclude that the task they were assigned was simply an impossible one to perform with any realistic expectation that the obscene might be accurately separated from the constitutionally protected. They were provided with no guide to the exercise of informed discretion, because there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity. * * * In consequence there were suppressed and withheld from the market for over two months 180 publications not found obscene. The fact that only one-third of the publications seized were finally condemned strengthens the conclusion that discretion to seize allegedly obscene materials cannot be confided to law enforcement officials without greater safeguards than were here operative. * * * " (Footnote omitted.)

11. The quotation is from the opinion of Mr. Justice Brennan in which Warren, C. J., and Douglas, J., join supporting the judgment of the Court. There is no majority opinion for the Court.

phasize the vital necessity, in the application of the test, that safeguards be provided to prevent denial of the protection of free expression which does not treat sex in a manner "appealing to the prurient interest." Sex and the portrayal of sex are not synonymous with obscenity but only material dealing with sex in a manner appealing to prurient interests is obscene. Roth, supra. The line between expression unconditionally guaranteed and protected and that which may be legitimately suppressed, regulated or punished is finely drawn. The separation of legitimate from illegitimate expression calls for "sensitive tools." [12]

■ As courts have repeatedly stated, evidence establishing "probable cause" need not be sufficient to establish guilt.[13] On the other hand, common rumor or report, suspicion, or even strong reason to suspect, are not sufficient to constitute probable cause for the issuance of an arrest warrant; [14] nor will they constitute probable cause for a search without a warrant.

The District Court concluded and the Government contends that here a "reliable informant" directly connected Peisner with obscene literature and a contemplated interstate transportation thereof; that federal agents had almost two years' knowledge of Peisner's connection with obscene materials; that federal agents observed Peisner and Disman loading packages, which could reasonably have contained books or papers, in Peisner's car; that surveillance showed the defendants in association with known purveyors of obscene material; that defendants were followed and observed as they transported the packages through three states; that defendants employed evasive driving tactics to avoid the federal agents; that this background information and these facts constituted probable cause for the search, the arrest of the defendants and the seizure of the publications. We are forced to disagree.

In reviewing the evidence, we find that the agent who was watching the Peisner residence before the defendants drove away admitted that he had no knowledge of the nature of the materials loaded in the Peisner car although he understood that an FBI colleague had received an informer's tip. Indeed, he testified the packages were "similar to reams of stationery." Another agent, in charge of the investigation's field operations, also acknowledged that he had no information that there was obscene literature in Peisner's car and that there was nothing observable to indicate that the packages contained books, much less *obscene books*. In fact, this latter agent indicated on cross-examination that the FBI acted as it did on November 1 on the basis of opinion and suspicion that Peisner was transporting obscene books. No one in the FBI had read any of the books which were found and seized nor had there been any determination by anyone, so far as disclosed by the record, that the materials being transported were obscene. Supposedly, the informant told the FBI that Peisner was planning to transport "obscene" materials, but the informant was not produced as a witness to tell what information he had or how the information was acquired; nor did the FBI agents reveal, if they knew, how their informant acquired his information. The FBI referred to the informant as reliable because of prior accurate tips but without further explanation; however, it was brought out that on at least one prior occasion a tip from the same source proved to be inaccurate. It is possible that, had the Government seen fit to disclose the informer's identity or pro-

---

12. See Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

13. See Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

14. See Henry v. United States, 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); United States v. Di RE, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1947).

duce him as a witness, there might have been a showing that the FBI did have information sufficiently specific and reliable to justify its action in the instant case. Unfortunately, in this particular, the District Court could only speculate. Furthermore, the arresting New Jersey State Police officer certainly had far less information concerning this whole situation than did the FBI.[15]

Though safeguards are necessary to protect the products of a free press in accord with the dictates of the First Amendment, we are not prepared to say that there must have been a prior determination of obscenity by a judicial officer to constitute probable cause for a search for and seizure of particular publications thought to be obscene. However, as a minimal requirement, we deem it essential that some qualified individual, aware of the proper test of obscenity as formulated and announced in Roth v. United States, supra, should have made a determination prior to search and seizure that a particular publication meets that test. In order to make such a determination, one must have read the whole or, at least, a very substantial portion of the suspected publication, not merely a few sentences, paragraphs or pages selected at random. If law enforcement officers have reasonable cause to believe that certain specific publications are obscene and are located in the place to be searched, a factual base offered to justify a search without a warrant must be sufficiently strong to support the issuance of a search warrant.

Bearing in mind the constitutionally protected freedom of expression as guaranteed by the First Amendment, and the constitutionally protected right of the people to be secure in their "papers and effects" against unreasonable searches and seizures as guaranteed by the Fourth Amendment, we reach the conclusion that here the requisite standard of probable cause for the search, seizure and arrests was not met. To repeat for emphasis, *Government* is not free to adopt whatever procedures it pleases for dealing with obscenity without regard to the possible consequences for constitutionally protected expression. Manual Enterprises, Inc. v. Day, 370 U. S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639, supra.

Defendant Disman has never claimed an interest in the seized contraband but he was lawfully in the car when the seizure was made. The Government acknowledges that he is a proper party to move for the suppression of the evidence under Rule 41(e) of the Federal Rules of Criminal Procedure. We agree. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

The defendants challenge the validity of the arrest warrants issued subsequent to the search and seizure. While the defendants and the seized publications were in the custody of the New Jersey police, an FBI agent from the Bureau's Newark, New Jersey, office was notified by telephone by the State Police that defendants were in custody. Upon arrival at the State Police Barracks, the FBI agent took defendants and the obscene publications into federal custody upon the authorization of an Assistant United States Attorney in New Jersey. Relying upon this authorization and "the information and belief of the agents in the Baltimore office," the FBI agent, on Sunday morning, November 2, 1958, obtained from a United States Commissioner warrants for the arrest of both defendants. FBI Agent Aldrich, upon whose complaint the warrants were issued, admitted that he had no personal knowledge of defendants' involvement in the criminal activities for which they were later convicted. The complaint sim-

15. We adopt that portion of the District Court's opinion, 198 F.Supp. 67 at 70–71, discussing *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed. 2d 1669 (1960). It is undisputed here that it makes no difference, from a constitutional standpoint, whether the search and arrests were made by federal or state authorities. In federal courts, the test as to the *reasonableness* of the search is one of federal law. *Elkins v. United States, supra.*

ply alleged that each defendant "did transport 1500 copies of obscene matter in interstate commerce on information and belief supplied by the Baltimore office of the FBI." Under the holding of Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the warrants are patently defective and invalid. It is the Commissioner's task to determine whether probable cause exists for the issuance of an arrest warrant; he is not permitted to rely upon the conclusory statement of the complainant that probable cause exists, and obviously he cannot rely upon the statement that the complainant believes that other undisclosed individuals possess information constituting probable cause for the arrest.

The Government argues that if the convictions of these defendants are not upheld, enforcement of the statute (18 U.S.C. § 1465) prohibiting the interstate transportation of obscene materials will be virtually impossible. Perhaps enforcement will be more difficult under today's ruling but, as Judge Learned Hand said, "[W]e take the law as we find it; under it the conviction[s] cannot stand." [16] This problem is not new, as recognized by the Supreme Court in United States v. Di RE, 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed.2d 210 (1948):

> "We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the

law as it has been given to us, this arrest and search were beyond the lawful authority of those who exe-·cuted them. The conviction based on evidence so obtained cannot stand."

██ We reach our ultimate conclusion in this case with great reluctance. The guilt of the defendants is plain. The District Judge discharged his obligation to determine the obscenity of the transported materials by performing the distasteful task of reading the several different books found in the Peisner automobile. He painstakingly pointed out in an oral opinion how the material on page after page was obscene, lascivious, lewd and revoltingly filthy. No one would dare contend that the books have any redeeming literary merit but, rather, in the words of the District Judge, they are "dirt for the dollar's sake." Under these circumstances, we think it not inappropriate to again remind all law enforcement officials of their sworn duty to act in strict compliance with the Constitution in their efforts to ferret out crimes and apprehend criminals and to make certain that those as obviously guilty as the two defendants here shall not escape punishment. Admittedly, this is not always a task easy of performance but the Government is not without adequate—indeed, powerful—means to apprehend and secure the conviction of persons who violate the laws. With the exercise of due care on the part of those engaged in law enforcement, guilty persons will be convicted and the convictions cannot be assailed for failure to meet constitutional requirements designed primarily to protect the innocent.

The defendants' motion to suppress the seized evidence should have been granted. The judgments of conviction based on that evidence must be set aside.

Reversed.

16. United States v. Coplon, 185 F.2d 629, 640 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952).