STATE OF NEW JERSEY, v. ROSARIO BONGIORNO
AND SAMUEL ZORN, DEFENDANTS.

Superior Court of New Jersey
**Law Division — Criminal**

Decided November 18, 1968.

*Mr. John Harrison,* Assistant County Prosecutor for the
State of New Jersey.

*Mr. Barry T. Parker* for defendants (*Messrs. Parker, Mc-Cay & Criscuolo,* attorneys).

KRAMER, PAUL R., J. C. C. (temporarily assigned). This is a motion to suppress evidence, namely, allegedly obscene magazines or booklets seized from two defendants as they traveled through the State of New Jersey from New York to Maryland.

The State contends that on April 10, 1968, at about 1:48 P. M., Trooper Talpas of the New Jersey State Police was patrolling the New Jersey Turnpike in Mount Laurel Township, Burlington County, when he saw a 1968 blue Plymouth sedan with New York license plates. This car was proceeding in a southerly direction and riding low in the rear." Defendant Zorn was the operator of the vehicle and defendant Bongiorno a passenger. It ultimately appeared that Zorn had borrowed the vehicle from one Varrone, who had rented it from the Kenny Car Rental System. The trooper stopped the vehicle for a routine check and was shown the proper license and ownership papers.

At this point the testimony becomes divergent, with defendants contending that the trooper peremptorily ordered the trunk opened, after which he seized the keys, opened the trunk and began ripping open unmarked cardboard cartons. I have concluded, on the basis of my observation of defendants and the manner in which they testified, that they were not telling the truth and that · Trooper Talpas merely questioned them as to why the car was riding so low in the rear, whereupon defendant Zorn attempted to bluff his way out of the situation and be on his way as soon as possible. The trooper's testimony was that Zorn, in his efforts to persuade him that he was a legitimate businessman and should be released, volunteered that he had "art magazines," said "Look, I'll show you," and then opened the trunk. I find that he himself opened one of the cardboard cartons and proffered the three exhibits to the officer.

Zorn selected three of the publications at random, which publications are as follows:

(1) *Girls in Love.* This is a paperback book which details the lesbian relationship of Suzette and Liz, her paramour. In addition to textual material detailing love-making, both homosexual and heterosexual, there are numerous colored photographs showing numbers of women wrestling, whipping one another or lying about embracing. In most of these photographs the breasts are exposed, the positions are suggestive, and the women wear only panties, stockings and shoes.

(2) *Grey Huff, No. 4 DSI.* This is a publication, evidently directed toward the homosexual market, consisting mostly of large photographs (colored and uncolored) of nude males with no attempt to either emphasize or hide the genitalia. Some sophistication is attempted, with brief one-or two-page articles on obscenity and punishment for homosexual crimes, and there are purportedly humorous short stories dealing with homosexuality.

(3) *Jet Set,* vol. 3. This is a magazine showing only nude females, all of whom are in suggestive positions with legs spread so as to accentuate the female sex organ.

The trooper testified that upon scanning the magazines by the side of the road he "thought they were obscene," advised defendants that he had never seen anything like them and would not want any member of his family to see them, whereupon he took defendants to the nearest barracks. They were held there a short period of time until the chief of the Burlington County detectives arrived. Chief McConnell declared the publications obscene and defendants were advised they were under arrest.

Having determined that there was no initial search in view of Zorn's desire to convince the trooper that he was a legitimate businessman dealing with art magazines, the court is now met with the difficult problem as to whether a valid arrest was made (either by the side of the New Jersey Turnpike when defendants were directed to accompany the

trooper, or later at the barracks when Chief McConnell declared the publications obscene and used formal arrest language), and whether the search at the barracks was lawful.

I find and determine that the arrest and search were reasonable under the facts here presented. I cannot accept the principle that under no circumstances may a police officer ever arrest when confronted with extreme examples of "hardcore pornography."

Defense counsel has argued capably the point that normally there should be judicial intervention in obscenity cases before either an arrest or a search may be accomplished. He contends that in view of the First Amendment, the right against unreasonable search and seizure protected by the Fourth Amendment requires higher procedural standards in such matters. It is argued that when obscene materials are shown to a police officer, he may never arrest and then search unless he has first gone to the nearest magistrate or court where the judicial mind can apply the delicate standards governing obscenity as laid down by our courts. Counsel cites *State v. Parisi*, 76 *N. J. Super.* 115 (*Cty. Ct.* 1962), as authority for his argument.

I cannot quarrel with the opinion of then County Court Judge Matthews. In that case the arrest and subsequent search were held unlawful in a situation where the detective made purchases of various publications from a newsstand. He would then take his purchases home, read them, determine whether the publications were obscene and, if so, proceed back to the newsstand for the arrest and search.

It seems to me that the desirable alternative of having a judge make the initial determination as to obscenity requires such a holding — where there is ample opportunity for the police officer to present the materials to a judge. Incidentally, there is no indication in *Parisi* as to the nature of the publications, *i. e.*, whether they were the more innocuous girlie magazines or whether, as here, the publications pictured graphically and in color homosexuality and sado-masochism, as well as close-ups of the female sex organ.

In his supplemental memorandum defense counsel cites as authority both *State v. Hudson County News Co.*, 41 *N. J.* 247 (1963), and *Marcus v. Search Warrant of Property*, 367 *U. S.* 717, 81 *S. Ct.* 1708, 6 *L. Ed.* 2d 1127 (1961). However, here again the courts were not dealing with cases involving motor vehicles. On the contrary, these cases represent instances where the police had obtained a search warrant but then carried out their search on the basis of their own *ad hoc* decisions. More specifically, in *Hudson County News,* Justice Proctor had before him a case where the detectives entered the defendant's warehouse with their search warrant and upon viewing thousands of magazines and books stacked on the floor, spent 2½ hours selecting some 700 magazines which *they* considered obscene. There again there was no indication as to the degree of obscenity.

Similarly in the *Marcus* case, a police officer, while executing a search warrant used not only the list of obscene publications which was the basis of the issuance of the warrant but also exercised, while in defendant's place of business, individual discretion in making determinations as to which other publications were to be seized.

An extensive and recent study of the subject is set forth in 5 *A. L. R.* 3d 1196 (1966), which deals with the case of *United States v. Arthur A. Peisner,* 311 *F.* 2d 94, 5 *A. L. R.* 3d 1196 (4 *Cir.* 1962). *Peisner* at first blush might seem to present facts somewhat similar to those in the instant case. There defendant's automobile was halted by New Jersey State Trooper on the Turnpike pursuant to information from the FBI that defendant was contemplating interstate transportation of obscene literature. When the trooper observed packages or cartons wrapped in brown paper as well as loose books (there was no indication in the opinion as to the nature of the books), he determined that probable cause existed, arrested the occupants and searched the car.

The significant distinction between our case and *Peisner* is that in *Peisner* the FBI had had defendant under sur-

veillance for an extended period of time. They had considerable background information concerning not only his activities but, further, had in their possession copies of obscene materials taken from defendant's premises as early as five months previously. In short, they had ample opportunity to obtain a search warrant. Furthermore, the Circuit judge very carefully sets forth the following:

"Though safeguards are necessary to protect the products of a free press in accord with the dictates of the First Amendment, we are not prepared to say that there must have been a prior determination of obscenity by a judicial officer to constitute probable cause for a search for and seizure of particular publications thought to be obscene. However, as a minimal requirement, we deem it essential that *some qualified individual*, aware of the proper test of obscenity as formulated and announced in Roth v. United States [354 U. S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498], supra, should have made a determination prior to search and seizure that a particular publication meets that test. * * *" (311 F. 2d, at *p.* 105, 5 A. L. R. 3*d*, at *p.* 1210; italics supplied)

In the present case Trooper Talpas acted reasonably. He escorted the two men to the barracks and then, instead of relying upon his own determination or that of the officer in charge at the barracks, he called the chief law enforcement officer of the county, namely, Chief McConnell of the Burlington County Detectives. The latter then formalized the arrest and conducted the search of the remaining materials in the car. In view of this, and in light of *State v. Boykins*, 50 *N. J.* 73 (1967), which considers as a factor making for the *reasonableness* of the arrest or search the fact that the search was of an automobile — can it be said that either the arrest or the search in this case was unreasonable? I conclude not.

To hold otherwise would be to say that on a crowded street an unidentified person might walk up to a police officer, exhibit to him photographs of the most indescribable filth, announce that he was about to sell them and then go about his business. The situation here is not much different.

An automobile proceeding on one of our high-speed throughways is stopped because the officer suspects some sort of contraband. Photographs, as described above, are exhibited to the officer, yet defendant Zorn now contends that, after admitting to the officer that he was a magazine dealer transporting the books for sale, the latter should have turned his back and permitted defendants to go on their way. I cannot agree.

For the reasons set forth above, the motion is denied.